# 14-1582-pr

# United States Court of Appeals
## for the
## Second Circuit

———◆❖◆———

JERMAINE SWABY,

*Petitioner-Appellant,*

– v. –

PEOPLE OF THE STATE OF NEW YORK,

*Respondent-Appellee.*

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX
## FOR PETITIONER-APPELLANT

JOEL B. RUDIN, ESQ.
LAW OFFICES OF JOEL B. RUDIN
*Attorneys for Petitioner-Appellant*
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 752-7600

## <u>TABLE OF CONTENTS</u>

*Page*

TABLE OF AUTHORITIES......................................................................... i

JURISDICTIONAL STATEMENT................................................................ 1

ISSUES PRESENTED FOR REVIEW........................................................... 2

STATEMENT OF THE CASE...................................................................... 3

STATEMENT OF FACTS........................................................................... 6

A.    The Trial................................................................................. 6

      1.    *Sandoval* Hearing....................................................... 6

      2.    Opening Statements..................................................... 6

      3.    The State's Account Of The Shooting......................... 8

      4.    The State's Forensic Evidence..................................... 10

      5.    The Defense Case:  Swaby's Account Of The Shooting............. 15

      6.    Harrison Further Sabotages His Own Client............... 16

      7.    The State's Evidence That Swaby Fled After The Shooting....... 18

      8.    Summations................................................................. 20

      9.    The Court's Charge And The Jury's Verdict............... 21

B.    Swaby's Ineffective Assistance of Counsel Claim............... 22

C.    The Habeas Petition................................................................ 28

*Page*

1.      The Court Finds Counsel Acted Unreasonably In Two
        Respects........................................................................................ 28

2.      The Court Finds Lack of Prejudice Under *Strickland*................ 32

ARGUMENT:

POINT I

        THE DISTRICT COURT ERRED IN HOLDING THAT THE
        TWO INSTANCES OF INEFFECTIVENESS IT FOUND –
        COUNSEL'S FAILURE TO CONSULT WITH A FORENSIC
        EXPERT AND HIS INTRODUCTION OF OTHER-CRIME
        EVIDENCE THAT IMPEACHED HIS OWN CLIENT – DID
        NOT PREJUDICE PETITIONER UNDER THE *STRICKLAND*
        STANDARD.......................................................................................... 33

        A.      Standard Of Review...................................................... 33

                1.      AEDPA Generally................................................ 33

                2.      Habeas Review Of Ineffective Assistance Of
                        Counsel Claims................................................ 35

        B.      The District Court Erred In Deferring To The State
                Court Regarding The *Strickland* Prejudice Element
                Where The State Court Failed To Conduct The
                Requisite Cumulative Error Analysis........................................... 39

POINT II

        DEFENSE COUNSEL ALSO WAS INEFFECTIVE,
        AND PREJUDICED THE DEFENSE, BY FAILING TO
        REQUEST A 'FLIGHT' OR CONSCIOUSNESS-OF-GUILT
        INSTRUCTION.......................................................................................... 49

CONCLUSION.................................................................................................. 55

## <u>TABLE OF AUTHORITIES</u>

*Case*                                                        *Page*

*Albrecht v. Horn*, 485 F.3d 103 (3d Cir. 2007)....................................  53

*Barkell v. Crouse*, 468 F.3d 684 (10th Cir. 2006)................................  36

*Bell v. Miller*, 500 F.3d 149 (2d Cir. 2007)...........................................  36, 46-47

*Boyette v. Lefevre*, 246 F.3d 76 (2d Cir. 2001)....................................  34

*Cullen v. Pinholster*, 131 S. Ct. 1388 (2011)......................................  5n

*Drake v. Portuondo*, 553 F.3d 230 (2d Cir. 2009)...............................  33

*Drake v. Portuondo*, 321 F.3d 338 (2d Cir. 2003)...............................  34-35

*Dugas v. Coplan*, 428 F.3d 317 (1st Cir. 2005)....................................  36

*Duncan v. Ornoski*, 528 F.3d 1222 (9th Cir. 2008)..............................  36

*Elmore v. Ozmint*, 661 F.3d 783 (4th Cir. 2011)..................................  38

*Eze v. Senkowski*, 321 F.3d 110 (2d Cir. 2003)....................................  37-38

*Garcia v. Graham*, No. 11-CV-0870, 2012 WL 2921624
    (W.D.N.Y. July 17, 2012)...........................................................  53

*Gersten v. Senkowski*, 426 F.3d 588 (2d Cir. 2005)............................  36-37, 47

*Harrington v. Richter*, 562 U.S. ___, 131 S. Ct. 770 (2011)...............  33-34

*Henry v. Poole*, 409 F.3d 48 (2d Cir. 2005).........................................  35

*Jiminez v. Walker*, 458 F.3d 130 (2d Cir. 2006)...................................  34

| *Case* | *Page* |
|---|---|
| *Lindstadt v. Keane*, 239 F.3d 191 (2d Cir. 2001) | 36, 37, 47 |
| *Mackey v. Russell*, 148 F. App'x 355 (6th Cir. 2005) | 38, 48, 53 |
| *Miranda v. Bennett*, 322 F.3d 171 (2d Cir. 2003) | 34 |
| *Moore v. Carlton*, 74 F.3d 689 (6th Cir. 1996) | 33 |
| *Murray v. Carrier*, 477 U.S. 478 (1986) | 38 |
| *Musladin v. Lamarque*, 555 F.3d 830 (9th Cir. 2009) | 52-53 |
| *Nelson v. Smith*, 504 F. Supp. 1139 (E.D.N.Y. 1981) | 36 |
| *Pavel v. Hollins*, 261 F.3d 210 (2d Cir. 2001) | 36, 37, 38 |
| *People v. Ali*, 146 A.D.2d 636 (2d Dep't 1989) | 51 |
| *People v. Baker*, 26 N.Y.2d 169 (1970) | 50 |
| *People v. Fiorentino*, 197 N.Y. 560 (1910) | 50-51 |
| *People v. Irizarry*, 24 Misc. 3d 1204A (Sup. Ct., Kings Co. 2009) | 3 |
| *People v. Jones*, 104 A.D.2d 826 (2d Dep't 1984) | 51 |
| *People v. Limage*, 57 A.D.2d 906 (2d Dep't 1977) | 51 |
| *People v. McKenzie*, 97 A.D.2d 774 (2d Dep't 1983) | 51 |
| *People v. Sandoval*, 34 N.Y.2d 371 (1974) | 6 |
| *People v. Swaby*, 8 A.D.3d 591 (2d Dep't 2004) | 4 |
| *People v. Swaby*, 3 N.Y.3d 682 (2004) | 4 |

| *Case* | *Page* |
|---|---|

*People v. Valentine*, 45 A.D.2d 1043 (2d Dep't 1974)........................ 51

*People v. Yazum*, 13 N.Y.2d 302 (1963)................................................ 50

*Porter v. McCollum*, 558 U.S. 30 (2009)............................................... 38

*Robinson v. Keane*, No. 08-CV-3426, 1999 WL 459811
    (S.D.N.Y. June 29, 1999)............................................................. 53, 54

*Strickland v. Washington*, 466 U.S. 668 (1984).................................. *passim*

*Swaby v. People*, 2014 WL 1347204 (E.D.N.Y. Mar. 31, 2014).......... 1-2

*Thompson v. Lemke*, No. 08-CV-3426, 2009 WL 4110290
    (E.D.N.Y. Nov. 23, 2009)............................................................. 53

*Usher v. Ercole*, 710 F. Supp. 2d 287 (E.D.N.Y. 2010)...................... 3

*Vega v. Walsh*, 669 F.3d 123 (2d Cir. 2012)....................................... 34

*White v. McAninch*, 235 F.3d 988 (6th Cir. 2000).............................. 53

*Wiggins v. Smith*, 539 U.S. 510 (2002)................................................ 35-36

*Wilson v. Mazzuca*, 570 F.3d 490 (2d Cir. 2009)................................ 38, 47

*Wolfe v. Brignano*, 232 F.3d 499 (6th Cir. 2000)................................ 33

*Constitution and Statutory Provisions*

United States Constitution

 Sixth Amendment.........................................................  39

 Fourteenth Amendment............................................  39

United States Code

 Title 28, Section 1291................................................  2

 Title 28, Section 2243..............................................  28

 Title 28, Section 2254............................................  2, 4, 34, 35

Federal Rules of Appellate Procedure

 Rule 32.1(a)................................................................  38n

New York Criminal Procedure Law

 Article 440.................................................................  *passim*

Criminal Jury Instructions (New York)

 Volume 1, Part 9.16 (1983)......................................  21-22, 49, 50

Sixth Circuit Rules

 Rule 32.1(a)................................................................  38n

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
----------------------------------------------------------X

JERMAINE SWABY,                                  :

                Petitioner- Appellant,        :

        -against-                              :

PEOPLE OF THE STATE OF NEW YORK,     :

             Respondent Appellee.         :

----------------------------------------------------------X

Docket No. 14-1582

_____

**APPELLANT'S OPENING BRIEF**
_____


**<u>JURISDICTIONAL STATEMENT</u>**

      This is an appeal from a final judgment entered in the United States District

Court for the Eastern District of New York (Vitaliano, J.), on April 7, 2014, dis-

missing a petition for a writ of habeas corpus, claiming ineffective assistance of

trial counsel, filed by Petitioner-Appellant, Jermaine Swaby.  *See Swaby v. People*,

2014 WL 1347204 (E.D.N.Y. Mar. 31, 2014), SPA-[1]1-40.  Swaby is a state prison-

er who was convicted of murder in the Supreme Court, Kings County, on May 10,

2002, following a jury trial.  The district court found ineffectiveness on two

grounds, but found lack of prejudice and dismissed the petition.  The court granted

a certificate of appealability limited to the two grounds, which this Court, by order

dated July 14, 2014, agreed to expand.

    The district court had jurisdiction over Swaby's ineffective assistance of

counsel claim pursuant to 28 U.S.C. § 2254.  This Court has jurisdiction over this

appeal pursuant to 28 U.S.C. § 1291.  Notice of appeal was timely filed on May 6,

2014.

## ISSUES PRESENTED FOR REVIEW

I.    Whether the district court erred in applying AEDPA deference under 28 U.S.C. § 2254(d), and in finding lack of prejudice, where the state court did not reach the prejudice issue and where trial counsel's failure to consult with or to use a forensic expert, and additional conduct preju-dicing his own client, so clearly impacted the result of the trial?

II.    Whether the district court erred in holding that trial counsel's failure to request a "flight" charge was not ineffective, where the State had made petitioner's flight a major issue at trial and, under New York law, peti-tioner was entitled to an instruction requiring the jury either to totally discount such evidence or to give it no more than "slight" value?

---

[1] Numbers preceded by "A-" refer to the Joint Appendix.  Numbers preceded by "SPA-" refer to the Special Appendix.

## STATEMENT OF THE CASE

The shooting of Shane Reynolds occurred outside Club Callalou, 527 Eastern Parkway, Brooklyn, New York, on September 30, 2001. Jermaine Swaby, nineteen years of age, was arrested for this shooting on November 28, 2001. On December 6, 2001, he was indicted on two counts of second-degree murder (intentional and depraved indifference) and second- and third-degree criminal possession of a weapon. The trial was held from May 6 through 10, 2002, before the Honorable Albert Tomei, Justice, Supreme Court, Kings County.

At his trial, Swaby was represented by Michael C. Harrison, a Brooklyn solo practitioner. (Harrison later was held, in two separate matters, to have provided ineffective assistance of counsel. The reviewing courts found that Harrison had prejudiced his clients by repeatedly falling asleep, making bizarre comments, failing to consult with essential experts, and gratuitously introducing evidence that helped the State's case (the same type of behavior that contributed to Swaby's conviction in this case). *See Usher v. Ercole*, 710 F. Supp. 2d 287 (E.D.N.Y. 2010) (Garaufis, D.J.) (granting federal habeas relief); *People v. Irizarry*, 24 Misc. 3d 1204A (Sup. Ct., Kings Co. 2009) (Del Giudice, J.S.C.) (granting collateral relief under N.Y. Criminal Procedure Law ("CPL") § 440.10).)

On May 10, 2002, Swaby was convicted of second-degree murder. On May 21, 2002, he received a sentence of 25 years to life in prison, which he continues to

3

serve at Green Haven Correctional Facility, Stormville, New York.  His conviction

was affirmed on appeal.  *People v. Swaby*, 8 A.D.3d 591 (2d Dep't 2004), *lv denied*, 3 N.Y.3d 682 (2004).

On October 14, 2005, Swaby filed a motion to vacate his conviction, pursuant to CPL § 440.10, based upon a claim of ineffective assistance of counsel.  Specifically, Swaby, supported by his own affidavit, the affirmation of his new counsel, and the affidavit of a forensic pathologist, Dr. Howard C. Adelman, claimed that he had been prejudiced by, among other errors, Harrison's failure to consult with any forensic expert or to otherwise investigate the case and prepare for trial, Harrison's conduct at trial that sabotaged Swaby, and Harrison's failure to request a standard "consciousness-of-guilt" instruction that would have negated or limited otherwise damaging "flight" evidence.  Swaby's motion was denied on March 23, 2006, *see* A-716-32, and the Appellate Division denied leave to appeal on July 11, 2006.  *People v. Swaby*, Ind. No. 9142/01, Dec. & Order on App. (2d Dep't 2006).

On August 9, 2006, Swaby filed a petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, and the matter was assigned to the Honorable Eric N. Vitaliano, United States District Judge, Eastern District of New York.  Despite petitioner's numerous requests to act on the petition, the court took *eight years* to de-

cide it.[2]  On March 31, 2014, the court found that counsel's performance had been

constitutionally deficient in two significant respects:  counsel inexcusably had

failed, prior to trial, to consult with an expert on how to deal with potentially de-

terminative forensic evidence related to the shooting, and counsel had prejudiced

his own client by introducing evidence, which the court otherwise had precluded,

that his client had used a knife to commit an unrelated robbery.  While the court

held that Swaby had not shown these errors met the prejudice test of *Strickland v.

Washington*, 466 U.S. 668 (1984), it granted a limited certificate of appealability.

*See* SPA-41-41.

On July 11, 2014, this Court granted Swaby's motion to expand that certifi-

cate to include review of additional instances of ineffectiveness that the district

court had rejected.

---

[2] On January 25, 2007, five months after Swaby filed his petition, the State moved to dismiss it; Swaby filed his opposition on March 5, 2007.  More than three years later, and only after Swaby's attorney wrote multiple letters to the court providing supplemental authority and noting the inordinate delay in resolving the petition, A-3, the district court ordered Harrison to file an affidavit addressing Swaby's ineffectiveness claims.  *Id.*  Harrison filed his affidavit on November 15, 2010, *id.*, and the case was fully submitted on February 4, 2011.  Seven months later, on August 23, 2011, the court ordered an eviden-tiary hearing, A-4, but following the Supreme Court's decision in *Cullen v. Pinholster*, 131 S. Ct. 1388 (2011), restricting habeas review to the state court record, adjourned it without date.  A-4.  Not until two and a half years later, after several additional letters from Swaby's attorney asking for the court to take action on the petition, A-5, did the dis-trict court finally issue its decision.  *Id.*

## STATEMENT OF FACTS

### A.    The Trial

#### 1.    *Sandoval* Hearing

During jury selection, the court held a hearing, pursuant to *People v. Sandoval*, 34 N.Y.2d 371 (1974), to determine the scope of cross-examination concerning Swaby's prior bad acts should he take the stand to testify.  The court held that while the State would be permitted to impeach Swaby by eliciting the fact of his prior conviction for robbery, it would not be permitted to elicit the underlying circumstances because the prejudicial effect of such an examination would outweigh its probative value.  A-9-10.

#### 2.    Opening Statements

In his opening statement, the prosecutor told the jury he would prove that Swaby committed an act of cold-blooded murder, an "execution," after he had been involved in the altercation inside Club Callalou.  The victim of the shooting, Shane Reynolds, Reynolds' friends, Swaby's friends, and Swaby's girlfriend, Faye Dunn, otherwise known as Janelle, had been involved in an altercation inside the premises.  According to the prosecutor, Swaby was ejected first, and then lay in wait.  When Reynolds came out, Swaby shot him in the head and, after Reynolds fell to the ground motionless, continued firing at him from point-blank range, hitting him a total of five times.  Swaby, the prosecutor said, then fled and remained

at large until detectives arrested him two months later. The victim died at the sce-
ne. A-24-29.

Swaby's attorney, Harrison, conceded that Swaby was the shooter, but
claimed in his opening that Reynolds was the aggressor and Swaby had acted in
self-defense. However, he did so in what the district court acknowledged was a
"confusing and rather bizarre statement." SPA-3. While apparently intending to
lay the groundwork for a justification defense, Harrison unnecessarily supplied the
State with a motive for the killing and further prejudiced his own client by terming
him a "predator" who was hunting "prey."

Harrison began as follows:

> Thank you. What will the evidence show? The
> evidence will show by example and what the evidence
> will show, as pointed out . . . in Samuel 17, moreover and
> moreover, David said the Lord will deliver who delivered
> Daniel from the paw of the lion, the paw of the bear he
> will deliver me from the sword of the Philistine. And
> when the Philistine Goliath looked down he disdained the
> lamb of the Lord.

> Shane [Reynolds] was drunk. Elmer Gantry was
> drunk. Shane was arrogant. Shane decided the power in
> his life was the dissemination of his sperm for the pur-
> pose of reproduction even if he did not actually do it. I
> made your girlfriend pregnant, I made your girlfriend
> pregnant. . . . Power can be when a lion takes over a prey
> and so then chooses to disseminate his sperm.

> The evidence is going to show that the deceased
> was drunk. The evidence is going to show that the de-

> ceased's idea of power, as pathetic and as paltry and as
> vile as it was, was, hey, I made your girlfriend pregnant,
> let me continue the humiliation and therefore I have
> power.

A-29-30.

Caught up in his bizarre rhetoric, Harrison then termed his own client a "predator" and Reynolds, whom he was trying to portray as the aggressor, the "prey." Noting that Swaby had left the bar, Harrison continued:

> [T]he man whom I will refer to as Mr. Sperm dissemina-
> tor, he couldn't wait to chase his prey, the hot, grinding,
> grizzly bear jaw hot at his heel, to chase the prey and *the
> predator became the prey. Not good enough to be the
> prey, he wanted the predator to be the prey but he had no
> choice . . . .*

A-33 (emphasis added).

### 3. The State's Account Of The Shooting

Trial testimony showed that, on September 30, 2001, Swaby, his girlfriend Faye Dunn, and Swaby's friends engaged in a brawl inside the Callalou nightclub with Reynolds and Reynolds' friends. Swaby was ejected from the club and shortly afterwards, so was Reynolds. Two witnesses – both friends of Reynolds' – testified they heard Dunn yell, "Pop that nigger," or "Pop him," and then heard shots. One witness heard a single shot, followed by four or five more. SPA-3-4.

8

While examining Reynolds' girlfriend, Sharaka Cuyler, Harrison continually referenced his theory that Reynolds had impregnated Faye Dunn. Harrison asked whether Ms. Cuyler had been "this great stud Shane's lover." A-89-90. "[W]hat is it about Shane that would make him so attractive to women? . . . What is it about Shane that makes him such a stud?" *Id.* Harrison asked Cuyler whether she was making up her testimony because she couldn't "accept the fact that Janelle was impregnated by Shane," A-98, and asked her whether the decedent had a pregnancy test performed on Dunn. A-101. Harrison asked Cuyler whether she knew Dunn was pregnant: "I mean, you're sharing the same man, maybe you'd know," and asked her if she knew whose baby Dunn had given birth to. A-95, 99.

Only one prosecution witness, Wayne Clarke, claimed to have seen the actual shooting. Clarke was a bouncer at the club whose job that night was to check patrons' identifications, while other guards supposedly frisked them for weapons. A-161-64. He had been hired for security notwithstanding his felony record in New Jersey for conspiracy to steal automobiles and five-year probationary sentence, which he had just completed. A-160. At about 4:30 a.m., Clarke claimed he saw Swaby exit the premises and leave the area. A-166-67. Clarke then walked through the gate to the club's entrance to see what was going on. A-168. He first heard, and then saw, Dunn, who was yelling, "Bring him out. Bring the mother fucker out" and "I want that mother fucker. Clap him. Clap him. I want him

9

dead." A-170, 172. Figuring that "something was going to happen," Clarke turned

to walk back through the club entrance to tell his colleagues inside the club, and

observed Reynolds walking in the opposite direction out of the club saying, "Fuck

with me, son," and reaching out with his hands. A-177. According to Clarke, a

"split second" later, he heard a gunshot, turned back, and then saw Swaby fire a

second shot towards Reynolds, who fell face forward onto the ground, his face to-

wards the street, his legs towards the nightclub entrance. A-178. At that point,

Swaby, according to Clarke, stood over Reynolds and fired four to six more shots

toward his body, which was motionless. A-179. The district court observed that

Harrison's cross-examination of Clarke "elicited no helpful testimony for the de-

fense." SPA-6.

### 4. The State's Forensic Evidence

Police witnesses testified that a car was parked next to the sidewalk where

Reynolds' inert body was found, facing the street. Reynolds' fingerprint was

found on the front passenger side window of the vehicle. A-223-36. Meanwhile,

the rear side window was shattered, with glass found both inside and outside the

vehicle. SPA-6. Seven shell casings were recovered, all from the same .22 caliber

revolver. The actual weapon was not recovered, but such a weapon would not fire

automatically, meaning the shooter must have pulled the trigger seven times. A-

212, 279, 283.  However, it was possible that the pressure needed to fire might be reduced due to a defect or an adaptation of the weapon.  A-284.

A New York City medical examiner, Dr. Charles A. Catanese, testified, based upon an autopsy that he conducted, that Reynolds died as a result of five gunshot wounds to his head.  One entered Reynolds' lower lip, had a path from front to back, and caused soft tissue injury.  A second entered Reynolds' lower left cheek a few inches from his lips, traveled through soft tissue, and exited in the right upper lip area.  A third shot entered above Reynolds' right cheek and stopped close to the entrance, with a path from front to back.  A fourth bullet entered the top of Reynolds' head, on a downward path from left to right and slightly back to front, and severely damaged about four inches of brain tissue.  The fifth bullet entered the lower left chin, fractured Reynolds' jaw bone, and came to rest in the soft tissue of his right chin.  A-292-300.  Catanese offered the opinion that the cause of death was the "[p]enetrating gunshot wounds to head with brain injury."  A-306.

Dr. Catanese testified that the deceased had additional injuries to his face, including multiple abrasions, a contusion, bruising, and gun fire stippling on his left hand and forearm.  A-301-06.  "Some" of the injuries, he testified, were consistent with Reynolds having been struck with a hard object or having hit his face on concrete.  A-306.  He also testified that Reynolds had a blood alcohol level of .06.  A-307.

Harrison conducted no cross-examination concerning the angle of fire or whether any specific shot was the cause of death. Instead, he launched into a manic assault on Dr. Catanese's character and motives. A-309-16.

Harrison accused Dr. Catanese of being paid by the District Attorney's Office; when Dr. Catanese responded by pointing out that the Medical Examiner's Office was a separate city agency that was independent of the D.A.'s Office, Harrison replied, "Whatever you say on that one anyway." A-309-10. While questioning Dr. Catanese about what the gun fire stippling indicated about the distance of the gun from the deceased ("several feet"), Harrison suddenly exclaimed, "Don't look at the DA to get an answer," which caused the ADA to point out, "I can't even see him." A-311. When Harrison asked whether Reynolds' "black eye was consistent with a punch," and Dr. Catanese responded, "It's possible that . . . injury was produced by a punch. It's a contusion," Harrison suddenly exclaimed, "I'm moving for a mistrial. Thank you." A-312. Outside the presence of the jury, he then bizarrely accused Dr. Catanese of a "poorly produced theatrical performance . . . . I don't know where this man's testimony is coming from, how it was manipulated, why it was manipulated this way. . . . [T]his testimony . . . is clearly coming out of nowhere, and I don't know why it's coming out of nowhere, etc., Your Honor, but he's clearly lying." A-313. The court denied the application and

instructed the jury to "disregard any irrelevant statements coming from the mouth of the attorney . . . ." *Id.*

Harrison then picked up where he had left off. He asked a long, hypothetical question which Dr. Catanese said he could not answer, after which Harrison asked, "Would you like a conversation with the District Attorney's office?" A-314. Finally, after Harrison insisted about questioning the doctor about Reynolds' urine alcohol level even though it was his blood alcohol level that provided a far more accurate measure of how much he had to drink before the shooting, and the mystified witness asked if he had misunderstood Harrison's question, Harrison concluded his bizarre, offensive cross-examination as follows:

> Q.    Absolutely not, doctor. And one could have benzoylecgonine in his blood having metabolized from cocaine down to benzoylecgonine, down to a non-detectable metabolite, and you wouldn't have known if he had sniffed cocaine 24 hours before, if you even know the answer to that?
>
> A.    I don't understand the question.
>
> THE COURT: He doesn't understand the question.
>
> Q.    You don't understand what benzoylecgonine is?
>
> A.    No, I didn't say that. I don't understand what you're asking me about.
>
> Q.    What medical school did you go?

A.    I went to Downstate in Brooklyn.

Q.    What were your M-C-A-T scores?

THE COURT:  Sustained.  The jury is to disre-
gard.  The jury is to disregard it.

MR. HARRISON:  I have no further questions,
Your Honor.

A-316.

The last significant forensic evidence concerned the position of Reynolds'

body on the street during and after the shooting.  Dr. Catanese testified that all the

shots entered Reynolds' face.  However, every witness testified that Reynolds fell,

or was found lying, face down.  *See, e.g.,* A-43 (P.O. Whittle:  he found Reynolds

"face down, right at the curb"); A-125 (Jamar Carr, Reynolds' friend:  Reynolds

was "laying face down"); A-127 (Carr:  "laying face down, right by a car, on the

sidewalk"); A-179 (Clarke:  "the gentleman that got shot fell forward, he fell

down, his face was down and the gentleman that shot him stood over him just like

that and emptied the gun"); A-180 (Clarke:  "Fell flat on his face . . . his face was

almost hanging over the sidewalk . . . .").

The prosecutor certainly believed Reynolds was lying face down, question-

ing Wayne Clarke as follows about Reynolds's position when the police arrived:

14

Q.    Did you see the guy who you had seen *lying face down* on the sidewalk?

A.    Yes, sir.

Q.    Where was he in relation to where you had last seen him?

A.    Still in the same place.

Q.    Had he moved at all?

A.    No.

A-185 (emphasis added).

Harrison, apparently unaware of the discrepancy between Clarke's claim that Swaby shot Reynolds while he was lying *face down* and the medical testimony that Reynolds was shot *in the face*, did not develop this issue at all during the trial.

**5.    The Defense Case: Swaby's Account Of The Shooting**

Swaby testified in his own defense that he shot Reynolds because he feared that Reynolds, who rushed at him with his hand behind his back, was going to stab or kill him.  A-330-31.

Swaby said that, immediately before the shooting, he saw Reynolds running at him, looking angry and crazed, with one hand reaching behind his back.  A-327-28.  Reynolds smashed him into the parked car, pinned him against it, and was again reaching behind his back, when Swaby pulled out his own gun.  A-328-29.  At the time, he had no avenue of escape.  A-330.  They struggled for the gun, but

15

Swaby, terrified, pulled the trigger. A-402. Swaby had the sensation of having "blacked out," A-333, "it was like [the gun] just kept going off." A-402-03. He felt as if he was closing his eyes. A-333. He did not recall aiming the gun. A-404, 405.

Fearing that the decedent's friends from inside the club would kill him, Swaby fled the scene. A-408-11, 415. While he later arranged to surrender through an attorney, when the attorney demanded a fee which Swaby could not afford, he did not show up at the police precinct on his own, fearing that he would be harmed by the police and that he might receive the death penalty for the shooting, for which he expressed his regret. A-335-37, 416-17.

Contrary to Harrison's opening, Swaby denied even knowing Reynolds before the fight in the club, let alone that Reynolds supposedly had dated or impregnated Swaby's girlfriend, Faye Dunn. A-321, 322, 327, 414. This caused the prosecutor to ask, "Where is all this coming from, do you know? . . . You never told your attorney that Shane Reynolds got your girlfriend pregnant?" A-352. Swaby denied it, reiterating that before the shooting he did not even know the decedent. A-352-53.

### 6.  <u>Harrison Further Sabotages His Own Client</u>

Despite the state court's pretrial *Sandoval* ruling prohibiting the State from eliciting any information about Swaby's robbery arrest besides the bare fact of the

conviction, Harrison conducted a prolonged direct examination of Swaby about the incident which emphasized that he had committed the robbery at knifepoint:

Q.   Have you been convicted of a robbery?

A.   Yes, sir.

Q.   In that robbery was the weapon used a gun?

A.   No, sir.

Q.   What weapon was used in the robbery?

A.   A knife.

Q.   How old were you when you committed the robbery?

A.   Seventeen.

THE COURT:     How old are you now?

THE WITNESS:   Nineteen.

Q.   And did you do that robbery alone?

A.   Yes, sir.

Q.   Now did you put that knife in anyone in the robbery, did you knife somebody?

A.   No.

Q.   Did you plead guilty because you were guilty?

A.   Yes, I did.

A-323-24.

17

Thereafter, during his summation, Harrison referred to Swaby as "a robber with a knife, a fool with a gun." A-435.

Harrison also surprised Swaby on re-direct by having him perform, with no preparation, a disastrous in-court demonstration of how the shooting occurred. In the re-enactment, Harrison at first played Swaby, with Swaby playing Reynolds; they then switched roles. A-417-19. As the district court wrote: "The exercise was apparently confusing to the trial judge (and, presumably, the jury), with the judge indicating that he could not determine who was playing whom." SPA-8.

### 7. The State's Evidence That Swaby Fled After The Shooting

The State made a huge issue out of Swaby's flight from the scene of the shooting and his failure to voluntarily surrender during the two months. The prosecutor began this emphasis in his opening statement. *See* pp. 6-7, *supra.* Then, he repeatedly reminded the jury of the issue in his questioning of witnesses. He elicited from Jamar Carr and Wayne Clarke that Swaby fled. A-131, 184-85. He questioned the assigned homicide detective, Robert Carboine, extensively about Swaby's flight from the scene, his failure to appear even after his lawyer had arranged his surrender, his failure to surrender even after the detective left word he was looking for him with numerous friends and relatives, and his ultimate arrest by other detectives. A-247-52. He cross-examined Swaby about the same issue for twelve pages. A-341-49, 367-69. Finally, the prosecutor devoted nearly three

18

pages of his summation to Swaby's flight and its significance to the question of his

innocence or guilt:

> There's no self-defense here. Defendant himself acts as though he knows it wasn't self-defense. Doesn't put the gun down and wait for the police. Maybe that's too much to ask. All right, come on . . . give me a break. He won't do that. But he doesn't call 911 at the earliest opportunity. He gets rid of the murder weapon. Obviously he doesn't want to get caught with it. He doesn't want the police to really examine it and see whether or not it had a hair trigger, which is an easy enough test. Doesn't turn himself in at the precinct. What the defendant does is he runs and he keeps running for two months.

> The cops talk to his brother Howard. They talk to his mom, his dad. They talk to his parents' tenants. They talk to the defendant's aunt. They talk to his two cousins. They visit every significant person in his life and they can't find defendant. You know why? Because the defendant is on the lam, folks. He's running, not just running from the cops, he's running from you. He doesn't want you to decide whether or not what he did was murder because, of course, it was murder. There's no other reasonable view of the evidence. This was not the response of a man who believed in his own head that he's simply defending himself. This was the response of a man who knew in his own heart and his own head that he had murdered somebody. And the last thing he wanted to do was get caught.

> Defendant had no contact with his parents, didn't stay with his family where he had been living for the last however long, all his life. He goes home briefly for a couple hours maybe to pack a bag and then bam, he's gone, disappears for two months.

A-467-69.

8.    **Summations**

Although Wayne Clarke's testimony was the State's only evidence that

Swaby either had committed the shooting or had done so without justification, Har-

rison called Clarke a credible witness with no reason to lie: "this is what he said,

that's what happened." A-428. Evidently Harrison did so because he wanted the

jury to credit Clarke's testimony that Reynolds had moved towards Swaby saying,

"Fuck with me, son," which arguably supported Swaby's justification defense.

However, having accredited Clarke, Harrison then argued the truthfulness of

Swaby's testimony – which directly contradicted Clarke's – that Reynolds attacked

Swaby and they struggled over Swaby's gun. Harrison contended that it was dur-

ing the fight between Swaby and Reynolds that Reynolds touched the front car

window and left a fingerprint, and that he "smashed [Swaby] into [the] car," break-

ing the rear window, and leaving Swaby with no avenue of escape. A-436, 439,

445-46. Swaby, he contended, "went on automatic pilot for a minute or blacked

out. He said, 'I closed my eyes.'" A-447.

Obviously cognizant of the damaging evidence of Swaby's flight, Harrison

returned to the subject repeatedly to proffer innocent reasons for it. Swaby, he

said, had reason to fear Reynolds' friends and didn't "stick around and risk being

killed." A-436. Thereafter he was scared about being arrested or convicted, at a

20

minimum for illegal gun possession, and feared the death penalty for the killing,

and there was a breakdown of communication with his attorney.  A-448.

Besides emphasizing Swaby's flight, the State, further exploiting Harrison's

theory in his opening statement that Reynolds had taunted Swaby about having sex

with Swaby's girlfriend, argued that Harrison's opening statement discredited

Swaby and provided evidence of motive:

> Was there more to it than [the fistfight]?  I don't know . .
> .  For some reason defense counsel keeps telling you
> that Shane was a sperm disseminator.  I think that's in-
> sulting, but to use defendant's quote that he somehow got
> [Dunn] pregnant, I never heard any evidence of that in
> the whole trial.  In fact, defendant himself denies know-
> ing anything about it.  I'm not sure whether it's true or
> not.  I don't know where it's coming from.  But obvious-
> ly if defendant knew that Shane had fooled around with
> [Dunn] and that he had gotten [Dunn] pregnant, that
> would be a pretty powerful motive.  Did it happen or not?
> I don't know because defendant and his attorney can't
> even agree.

A-453.

### 9.  <u>The Court's Charge And The Jury's Verdict</u>

Despite the State's damaging argument that Swaby's flight demonstrated his

guilt and Harrison's effort in his own summation to suggest innocent reasons for

Swaby's flight, Harrison failed to request a standard "consciousness-of-guilt"

charge under State law directing the jury to completely disregard flight evidence if

there was any reasonable "innocent" explanation and, even in the absence of such an innocent explanation, to give such evidence just "slight" value. *See* 1 CJI(NY) 9.16 (1983).

The jury, after requesting read-backs of Clarke's and the medical examiner's testimony, convicted Swaby of intentional murder. It did not reach the depraved indifference murder and gun possession counts.

## B.    Swaby's Ineffective Assistance Of Counsel Claim

Following the affirmance of his direct appeal, Swaby, on October 14, 2005, filed a motion, pursuant to CPL § 440.10, arguing Harrison had been ineffective in numerous respects, including, most significantly, the following:

(a)    Harrison failed to consult with a forensic examiner for assistance in contradicting the State's case, supporting Swaby's justification defense, and developing a basis for an "excessive force" instruction under which Swaby could not be convicted of murder for using excessive force *after* already having fired the fatal shot in self-defense;

(b)    Harrison inexcusably prejudiced his own client by bringing out his use of a knife during a robbery, by falsely suggesting a motive to harm Reynolds due to sexual taunting and jealousy, and by acting offensively and bizarrely throughout the trial;

(c)    Harrison negligently failed to request a standard consciousness-of-guilt instruction under which the jury would have been instructed to entirely disregard Swaby's flight if there was a reasonable explanation for it or otherwise to give such evidence only "slight" value; and

(d)    Harrison failed in several ways to adequately prepare Swaby to testify.

*See* Memorandum of Law in Support of Swaby's CPL § 440.10 Motion ("CPL § 440.10 Mem. of Law"), A-619-48.

Swaby's motion was supported by an affidavit from Dr. Howard C. Adelman, the former Deputy Chief Medical Examiner for Suffolk County and a nationally recognized expert in pathology with 40 years of experience. Affidavit of Howard C. Adelman, Oct. 10, 2005 ("Adelman Aff."), A-568. Dr. Adelman wrote that, had he been consulted by defense counsel before the trial, he would have advised counsel that the forensic evidence was inconsistent with Wayne Clarke's account of the shooting and consistent with Swaby's. Adelman Aff. ¶ 3, A-569.

According to Dr. Adelman, four of the five shots that struck Reynolds in the face were non-lethal; only the shot to the top of his head caused his death. *Id*. at ¶¶ 4, 6, A-569. Contrary to Clarke's claim that, after the second shot was fired directly towards Reynolds, Reynolds fell face down and lay motionless, the two wounds to Reynolds' head with front to back tracks caused only soft tissue injury and were not likely to have caused a healthy teenage male to collapse. *Id*. at ¶¶ 6-7, A-569-70.

Contrary to Clarke's further testimony that Swaby stood over Reynolds and fired repeatedly into Reynolds' motionless body while he lay face down, Dr. Adelman wrote that all of Reynolds' wounds were to his face; none were to the back of his head or body. *Id*. at ¶ 5, A-569. Moreover, the location and trajectory

23

of the fatal shot to the top of Reynolds' head – slightly front to back and left to right – meant that, if the shot was fired while Reynolds was lying face down on the ground as Clarke reported, it must have been fired from the position of the parked car adjacent to Reynolds' body, an obvious impossibility. *Id*. at ¶ 8, A-570. Indeed, Dr. Adelman concluded, the angle of firing was "consistent with [the shot] having been fired during a physical struggle between Swaby and Reynolds." *Id*. at ¶ 11, A-571.

Finally, Dr. Adelman rejected the prosecution's theory that, contrary to Swaby's testimony that he was propelled into the rear of the car, breaking the window, by Reynolds' aggressive assault, the window was broken by Reynolds' head while he was falling. In Dr. Adelman's view, such a collision with Reynolds' face would have produced lacerations and other injuries that did not actually appear on him. Adelman Aff. ¶ 12. A-571.

Swaby's affidavit further supported his motion. Swaby swore that Harrison only interviewed him about the facts of his case on one occasion, shortly after his arrest, for just 20 minutes. *See* Affidavit of Jermaine Swaby in Support of CPL § 440.10 Motion, Oct. 7, 2005 ("Swaby Aff."), ¶¶ 3, 5, A-574-75. Harrison, who was privately retained, never asked Swaby or his family for funds to hire a pathologist, and did not apply to the court to have one appointed. *Id*. at ¶¶ 2, 6, A-574-75. Harrison never discussed trial strategy with Swaby or explained the legal

elements of self-defense or extreme emotional disturbance; never asked Swaby why he fled the scene and avoided the police after the incident; and never asked Swaby about his background and experiences, why he was carrying a gun, and why he believed that the decedent was about to use deadly physical force against him. *Id*. at ¶¶ 10-12, 14, 16, 20, 22, 33, A-576-78, 580. Harrison's theory that the decedent had impregnated Swaby's girlfriend was incorrect and Swaby had not suggested it to him. *Id*. at ¶ 12, A-576. Finally, Swaby stated that Harrison's decision, on redirect examination, to have Swaby join him in a physical re-enactment of the fight with Reynolds surprised him and had not been rehearsed. *Id*. at ¶ 15, A-576.

While Harrison would not give an affidavit, he admitted (or did not deny) to Swaby's new counsel, during an interview, that he had likely committed many of the errors asserted in Swaby's motion:

    (a)    He had no independent recollection of consulting a pathologist;

    (b)    He had never even heard of an "excessive force" defense or instruction;

    (c)    He had no recollection of or explanation for his argument that the deceased impregnated, or was a rival with Swaby for the affection of, Swaby's girlfriend;

    (d)    His "practice" was to object to, rather than to request, a charge minimizing flight or consciousness-of-guilt evidence;

    (e)    He did not remember the extent of his interviewing and preparation of Swaby to testify.

25

Affirmation of Joel B. Rudin in Support of Swaby's CPL § 440.10 Motion, Oct. 13, 2005 ("Rudin Affirm."), ¶ 18, A-531.

 The State opposed Swaby's motion, primarily on the basis that the trial record refuted it or that his claims should have been raised on direct appeal. The State did not dispute, among other things, that Harrison had failed to consult with a pathologist or other expert, there was no factual basis for his claim that Reynolds had impregnated Swaby's girlfriend, and his reason for not requesting a "flight" instruction was his general policy of not doing so. *See* Affirmation and Memorandum of Law in Opposition to Motion to Vacate, Jan. 10, 2006, A-649-78.

The state court, without hearing oral argument or holding a hearing, summarily denied the § 440.10 motion. Regarding Harrison's failure to consult with an expert, the court analyzed whether a reasonable attorney might have decided not to present expert testimony to contradict the State's case as presented *at trial*, but did not consider whether Harrison's *pretrial* decision not to consult with an expert was reasonable based upon the circumstances he faced at that time.

Focusing on the trial record, the court noted Dr. Catanese's testimony that the fatal shot was fired slightly downward, even though the deceased was taller than Swaby. It then assumed, without any further discussion, that such an angle of fire meant that "the victim had to be in a nonthreatening physical position," which was consistent with Clarke's testimony. SPA-12. Thus, the court concluded, call-

26

ing an expert "would have undercut the defense strategy" claiming justification and would not have supported an excessive force defense. *Id.* The court did not explain why the downward angle of fire necessarily dictated the conclusion (contrary to Swaby's testimony that they were struggling) that Reynolds was in a "non-threatening physical position," nor did it discuss the balance of Dr. Adelman's affidavit.

Second, the court rejected Swaby's claims that Harrison should have requested "flight" and "excessive force" instructions. SPA-13-14. Without citing any authority, the court simply asserted that generally such instructions are perceived to help the prosecution more than the defense. *Id.* The court conducted no analysis of whether it was reasonable for Harrison to decline to request the two charges under the facts of *this* case. The court did not address Swaby's argument that Harrison's failure to request an excessive force instruction was attributable to his failure to consult a forensic expert. *See* CPL § 440.10 Mem. of Law, A-615-17, 640-41.

Third, the court found, without any such evidence in the record, that Harrison's questioning of Swaby about his use of a knife to commit a robbery "was a preemptive strategy so that the facts would not be developed by the People on cross-examination or because the door could be opened by a possible remark by

the defendant. In any event this was considered by the court in its totality of evidence analysis and considered improper." SPA-17.

Finally, the court, despite holding no hearing, discredited Swaby's sworn claims that Harrison had not prepared him to testify. *Id.*

## C.      **The Habeas Petition**

Following the Appellate Division's denial of leave to appeal, Swaby sought review by means of a timely federal habeas corpus petition. Despite the command of 28 U.S.C. § 2243 that a hearing be held within five days of the return of the writ unless additional time is allowed for "good cause," and that the court determine the petition "summarily," it was not until Swaby spent eight additional years in prison that the district court finally determined Swaby's petition.[3]

### 1.      **The Court Finds Counsel Acted Unreasonably In Two Respects**

The district court held that "Harrison's decision not to consult and/or retain a forensic expert was manifestly unreasonable, as was the state court's determination to the contrary." SPA-31. The state court's analysis, contrary to federal law, had improperly focused on whether Harrison should have consulted an expert in light of the "evidence presented *at trial*, instead of the circumstances that existed when Harrison made the decision not to investigate the forensics related to Clarke's tes-

---

[3] *See supra*, note 2. During the eight year delay, Dr. Adelman passed away, while Harrison developed medical issues that make him unable to testify.

timony." SPA-30-31 (emphasis added). "[A]ny competent attorney" would have realized that a forensic expert had to be consulted because "any potential forensic evidence either supporting Swaby's version of events or somehow undercutting the prosecution's was critical to the case. . . . Unquestionably, an effective defense could not be provided without such an investigation." SPA-31.

The district court disagreed with the state court's conclusion that Harrison made a reasonable "strategic decision" not to impeach Clarke's account of how the shooting occurred, reasoning that "no deference is owed to strategic decisions made after a less than complete investigation." SPA-32 (citation omitted). Such a decision, moreover, was inherently unreasonable, since

> . . . [w]hatever help Clarke's testimony might have given to the petitioner's defense was vastly outweighed by the fact that Clarke, the only eyewitness to the shooting, testified that Swaby shot Reynolds before Reynolds even got near him, and then, after Reynolds was felled by gunfire, that Swaby shot a defenseless Reynolds in the head multiple times at close range. Clarke's testimony, indeed, was the crux of the People's case, and was almost completely in conflict with Swaby's version of events. In short, Clarke's testimony was devastating to the defense and he had to be impeached, if at all possible. Forensic evidence could have been the ground for impeachment. It had to be pursued unless and until an adverse report ruled it out.

SPA-32-33.

Finally, the district court held that the state court's finding that counsel acted reasonably "was clearly unreasonable. Even when guided by AEDPA deference, Harrison's performance on this point does not pass muster under *Strickland*'s first prong." SPA-33.

Significantly, although the district court ruled for Swaby on this aspect of Harrison's ineffectiveness, the district court neglected to decide the related question of whether Harrison's failure to consult with an expert also contributed to his failure to establish a basis for an "excessive force" instruction. While the court held that Harrison's failure to request such an instruction, on the basis of the *actual* trial record, was not unreasonable, *see* SPA-18-19, it overlooked Swaby's additional argument that Harrison could have established an evidentiary basis for the instruction had he bothered to consult with a forensic expert such as Dr. Adelman. Dr. Adelman's affidavit showed that he would have been able to assist Harrison in establishing that the fatal shot was fired during a struggle, before Reynolds fell, incapacitated, to the ground, and thus any additional, unnecessary shots that Clarke claimed Swaby fired were not the cause of death. *See* CPL § 440.10 Mem. of Law, A-628.

As for Harrison's examination of Swaby about his use of a knife, the district court held that the state court's conclusion was an "unreasonable" application of federal law. SPA-28-29. Harrison, contrary to the state court's assumption, could

not reasonably have been intending to blunt the State's cross-examination of Swaby about his use of a knife during the robbery, since the trial court's *Sandoval* ruling had precluded any such examination. *Id.* Moreover, Swaby's use of a knife on this separate occasion did not make it less likely that he was the aggressor when he used a gun against Reynolds. *Id*.

The district court upheld the reasonableness of the state court's conclusion that Harrison was not ineffective for failing to request a flight charge. SPA-14-15. The district court reasoned that a defense attorney could reasonably conclude that "disclosing to the jury the fact that flight evidence can be probative, albeit only slightly, of a defendant's guilty conscience" "far outweighed" the potential beneficial effects of such an instruction. SPA-15. In reaching this conclusion, the court overlooked that a flight charge commands the jury to *totally discount* flight evidence if the defense proffers an innocent explanation, and did not appear to consider that the State's heavy emphasis on flight throughout the trial already guaranteed that the jury would consider such evidence against Swaby.

Finally, deferring to the state court under AEDPA, the district court rejected Swaby's ineffectiveness claim based on Harrison's failure to fully interview him or to prepare him to testify at trial. SPA-19-20.

31

## 2.    __The Court Finds Lack of Prejudice Under__ *Strickland*

As to each of Harrison's above two errors, the district court found that Swaby had not been prejudiced under *Strickland*.  Although Harrison's performance was "strikingly deficient," his errors made no difference to the outcome, in the district court's view, because there was "overwhelming evidence of Swaby's guilt, viewed in the totality of the circumstances, [that] Swaby would have been convicted regardless of Harrison's deficiencies, [and] *on AEDPA review*, the state court's ultimate conclusion that Harrison was not constitutionally ineffective cannot be disturbed."  SPA-33 (emphasis added).  The "overwhelming" evidence, the district court wrote, consisted of the testimony of one "impartial eyewitness" (Clarke) together with Swaby's failure to introduce, either at trial or on collateral attack, any "forensic evidence . . . [that] contradicts that account of the shooting."  SPA-36.  Dr. Adelman's affidavit did not consist of such evidence, the court concluded, because Dr. Adelman's testimony about the angle of the shots somehow would have "bolstered," not contradicted, the State's case, and was based upon "a gross misconstruction of both the medical evidence and Clarke's description of the scene."  SPA-33-34.

**ARGUMENT**

**POINT I**

**THE DISTRICT COURT ERRED IN HOLDING THAT THE TWO INSTANCES OF INEFFECTIVENESS IT FOUND – COUNSEL'S FAILURE TO CONSULT WITH A FORENSIC EXPERT AND HIS INTRODUCTION OF OTHER-CRIME EVIDENCE THAT IMPEACHED HIS OWN CLIENT – DID NOT PREJUDICE PETITIONER UNDER THE *STRICKLAND* STANDARD**

**A.  Standard Of Review**

**1.  AEDPA Generally**

This Court reviews the district court's legal conclusions denying a habeas petition *de novo* and its factual findings for clear error.  *Drake v. Portuondo*, 553 F.3d 230, 239 (2d Cir. 2009).  However, "when the district court's decision in a habeas case is based on a transcript from the petitioner's state court trial, and the district court thus makes 'no credibility determination or other apparent finding of fact,' the district court's factual findings are reviewed *de novo*."  *Wolfe v. Brignano*, 232 F.3d 499, 501 (6th Cir. 2000) (quoting *Moore v. Carlton,* 74 F.3d 689, 691 (6th Cir. 1996)).

Under AEDPA, a federal court may grant relief if the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was

33

based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1)-(2).  Under that standard, the Court can overturn a state court ruling where it was 'so lacking in justification that there was . . . [no] possibility for fair minded disagreement.'"  *Vega v. Walsh*, 669 F.3d 123, 26 (2d Cir. 2012) (quoting *Harrington v. Richter*, 562 U.S. —, 131 S. Ct. 770, 786–87 (2011)).

"[W]hen a state court has articulated its reasons for rejecting some elements of a federal claim, AEDPA deference applies only to the elements that the state court discussed. Thus, a federal court may grant the writ under AEDPA if the adjudication of the discussed elements was objectively unreasonable and the adjudication of the undiscussed elements was simply erroneous."  *Jiminez v. Walker*, 458 F.3d 130, 143 (2d Cir. 2006) (citing *Boyette v. Lefevre*, 246 F.3d 76, 91 (2d Cir. 2001)); *see also Miranda v. Bennett*, 322 F.3d 171, 178 (2d Cir. 2003) ("Where it is impossible to discern the Appellate Division's conclusion on [the relevant] issue, a federal court should not give AEDPA deference to the state appellate court's ruling.").

As to the state court's findings of fact under AEDPA, normally, "a determination of a factual issue made by a State court shall be presumed to be correct."  28 U.S.C. § 2254(e)(1).  However, the presumption does not apply where the state court summarily denied the claim without holding a hearing on a contested factual

34

issue "and thus there [were] no findings of fact requiring deference." *Drake v. Portuondo*, 321 F.3d 338, 345 (2d Cir. 2003). Even where AEDPA deference applies, the relevant state court findings of fact may be rebutted by contrary evidence that is clear and convincing. 28 U.S.C. § 2254(e)(1).

### 2. Habeas Review Of Ineffective Assistance Of Counsel Claims

To prevail on his ineffectiveness claim, a habeas petitioner must show both that counsel's performance fell below a reasonable level of professional competence and that he was prejudiced as a result. *See Strickland*, 466 U.S. 668. "Prejudice" is defined as a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Under this standard, the petitioner "*need not show* that counsel's deficient conduct *more likely than not* altered the outcome of the case." *Id.* at 693, *quoted in Henry v. Poole*, 409 F.3d 48, 63 (2d Cir. 2005) (emphasis in quotation). A "reasonable probability" is less than a preponderance of the evidence and need not be "more likely than not"; it is "a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

The duty of counsel to prepare for trial includes the obligation "to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id*. at 691. An "informed choice among possible defenses" can only be made after reasonable investigation. *Wiggins v. Smith*, 539

35

U.S. 510, 525 (2003); *see also Nelson v. Smith*, 504 F. Supp. 1139, 1145 (E.D.N.Y.

1981) (Weinstein, C.J.).

It is ineffective for counsel to fail to consult an expert where such consulta-

tion is reasonably necessary to adequately prepare the defense. *Pavel v. Hollins*,

261 F.3d 210, 220-24 (2d Cir. 2001); *Lindstadt v. Keane*, 239 F.3d 191, 201, 204

(2d Cir. 2001). Consultation with an expert may be essential for a lawyer to be

able to effectively challenge the State's case through cross-examination and other

avenues, to formulate a theory defense, and to help prove a defense through the

expert's own testimony. Thus, in *Bell v. Miller*, 500 F.3d 149, 156-57 (2d Cir.

2007), defense counsel was ineffective for failing to consult a medical expert re-

garding the reliability of the shooting victim's identification of the defendant,

where expert testimony would have greatly assisted counsel in casting doubt on the

identification, and there was no tactical or strategic justification for counsel's

omission. *See also Duncan v. Ornoski*, 528 F.3d 1222 (9th Cir. 2008) (failure to

consult a serology expert); *Barkell v. Crouse*, 468 F.3d 684, 699 (10th Cir. 2006)

(failure to consult child psychiatric expert who could have helped defense counsel

more effectively cross-examine State's expert); *Dugas v. Coplan*, 428 F.3d 317

(1st Cir. 2005) (failure to consult arson expert); *Gersten v. Senkowski*, 426 F.3d

588, 609-11 (2d Cir. 2005) (failure to consult expert rendered counsel "unable to

mount an effective cross-examination" and caused him to "miss[] an opportunity"

36

to undermine the credibility of the prosecution's star witness); *Lindstadt*, 239 F.3d at 201, 204 (failure to "contact[] an expert, either to testify or (at the least) to educate counsel," where "failure to investigate prevented an effective challenge to the credibility of the prosecution's only eyewitness").

While truly "strategic decisions" are "virtually unchallengeable," the phrase only applies to decisions "made after thorough investigation of law and facts relevant to plausible options." *Strickland*, 466 U.S. at 690. That is, "strategy" is "conscious, reasonably informed" decision making "with an eye to benefitting" the client. *Pavel*, 261 F.3d at 218. "[W]e judge the reasonableness of the purported 'strategic decision' on the part of defense counsel 'in terms of the adequacy of the investigations supporting' it." *Gersten*, 426 F.3d at 609-10. Thus, a decision not to challenge forensic evidence, or to challenge it without the assistance of an expert, will not be deferred to as "strategic" where it was made without the benefit of clearly necessary expert consultation. *Id*.

Even though a habeas petitioner claiming ineffectiveness ordinarily faces a "heavy burden" to overcome the usual double deference – to the strategic judgments of trial counsel and to the constitutional determination of the state court – "if certain omissions cannot be explained convincingly as resulting from a sound trial strategy, but instead arose from oversight, carelessness, ineptitude, or laziness, we would find the quality of representation sufficiently deficient to grant the writ."

*Eze v. Senkowski*, 321 F.3d 110, 112 (2d Cir. 2003); *accord Wilson v. Mazzuca*, 570 F.3d 490, 502 (2d Cir. 2009).

When the state court fails to determine both *Strickland* elements – the conduct of counsel and its prejudicial effect – the federal habeas court must review the undecided element *de novo*. *Porter v. McCollum*, 558 U.S. 30, 39 (2009).

While ineffective assistance may be premised upon a single error that, regardless of the balance of the representation, is sufficiently egregious and prejudicial to compromise the defendant's right to a fair trial, *see Murray v. Carrier*, 477 U.S. 478, 496 (1986), if defense counsel makes several errors, analysis as to whether his performance was unreasonable and prejudice occurred is cumulative. *See Pavel*, 261 F.3d at 216. Where the state court fails to evaluate all the errors under this requisite cumulativeness standard against the complete trial court record, no AEDPA deference applies because the state court decision is contrary to clearly established Supreme Court law and constitutes an unreasonable application of such law. *See Elmore v. Ozmint*, 661 F.3d 783, 868 (4th Cir. 2011), *as amended* Dec. 12, 2012; *Mackey v. Russell*, 148 F. App'x 355, 368-69 (6th Cir. 2005)[4] (citing *Williams v. Taylor*, 529 U.S. 362, 395-96 (2000)).

---

[4] Under Sixth Circuit rules, such an unpublished decision may be cited, and the limitations of Rule 32.1(a) of the Federal Rules of Appellate Procedure do not apply. *See* 6 Cir. R. 32.1.

**B.      The District Court Erred In Deferring To The State Court Regarding The *Strickland* Prejudice Element Where The State Court Failed To Conduct The Requisite Cumulative Error Analysis**

The district court correctly upheld two of Swaby's ineffectiveness claims. However, as we show in this section, the court erred in holding, under the second prong of the *Strickland* test, that the cumulative effect of these two errors was not sufficiently prejudicial to require the conviction to be vacated under the Sixth and Fourteenth Amendments.  Should this Court agree with our position, it will not need to reach the question, posed in Point II below, of whether Harrison's additional error in not requesting an instruction minimizing "consciousness-of-guilt" evidence, added to the errors already found by the court below, crosses the *Strickland* prejudice line and entitles Swaby to habeas relief.

Turning first to the district court's ruling concerning Harrison's negligence, the court correctly held that Harrison unreasonably failed to consult with any forensic expert concerning the shooting evidence.  The court reasoned that it would have been obvious to any reasonable defense attorney that the forensic evidence was likely to be critical to the jury's factual determination whether to credit the State's view of the shooting beyond a reasonable doubt, or Swaby's.  The court correctly declined under AEDPA to defer to the state court's decision that Harrison acted reasonably *during trial* in not consulting a pathologist or other expert in order to rebut the State's evidence.  This was because, consistent with Supreme

39

Court law, Harrison was required to make such a decision *before* trial. *Pretrial* consultation with an expert was necessary to guide Harrison, before the trial unfolded, in analyzing the forensic evidence, determining a theory of defense, deciding how to examine the State's and any defense witnesses, and deciding whether to present expert testimony on behalf of the defense. As the court put it, "in real time, at the start of defense preparation, any potential forensic evidence either supporting Swaby's version of events or somehow undercutting the prosecution's was critical to the case. The Court cannot imagine any reasonable excuse for Harrison's failure to see the utility of an expert. . . . Unquestionably, an effective defense could not be provided without such an investigation." SPA-31.

Second, the district court correctly held that Harrison acted unreasonably, for no apparent strategic purpose, in eliciting from Swaby that he had used a knife during an unrelated robbery, when the trial court's *Sandoval* ruling had precluded the State from inquiring about the underlying facts of this crime. Swaby's use of a knife during a robbery did not tend to establish that he did not use a gun aggressively, or without justification, in the shooting at issue in this case. The district court termed Harrison's tactic a "significant blunder," and held that the state court's contrary ruling was "unreasonable." SPA-29.

In analyzing whether the above two errors prejudiced Swaby under *Strickland*, the district court erred in subjecting the state court's denial of Swaby's claim

to deferential "AEDPA review." SPA-33. The state court did not determine the prejudice question with respect to Swaby's expert-consultation claim, since it held that Harrison's performance in this respect was not deficient at all. There can be no AEDPA deference to a "finding" the state court never made. *See* pp. 34-35, *supra*. While the state court's decision did appear to assume error regarding the knife issue and to reject that Swaby was prejudiced by this error alone, *see* A-732, it failed to conduct the requisite *cumulative* prejudice analysis that also assumed ineffectiveness with respect to the expert consultation issue.

However, whether AEDPA deference is owed or not, the district court erred in finding that Swaby had not met his burden to show prejudice. Swaby's state motion and federal petition claimed that Harrison had been ineffective by failing to consult with a forensic pathologist, such as Dr. Adelman, who could have assisted him in challenging the State's case, both through his examination of the witnesses and his presentation of a defense. Only one witness, Clarke, claimed to have seen Swaby outside the club when the shooting occurred, to have seen him commit the shooting at all, and to have seen him do so in a manner that was not justified. This was hardly "overwhelming evidence." Harrison, aided by the insights that a forensic pathologist such as Dr. Adelman could have provided him, would have been able to significantly directly contradict Clarke's story.

41

First, Clarke claimed that two shots were fired towards Reynolds as he approached Swaby head-on, and that Reynolds then fell facedown, motionless and incapacitated, only to have Swaby stand over him and fire multiple shots into his inert body. However, as Dr. Adelman pointed out, only two of Reynolds' facial wounds had a front to back track, and they merely caused flesh wounds and would not have incapacitated Reynolds. Thus, Clarke's claim that Reynolds just dropped to the ground and lay motionless, after facing Swaby and being shot, was highly unlikely to be true.

Second, Clarke and the other of the State's witnesses testified that Reynolds fell, or was found, *face down*, his head hanging off the sidewalk over a curb, next to the parked automobile. *See* pp. 10, 14, *supra*. If Clarke was telling the truth about Swaby firing towards Reynolds while he was in that position, according to Dr. Adelman, Reynolds would have suffered additional wounds to the *back* of his head. However, as Dr. Adelman pointed out, all of his additional wounds were from shots fired into the front of his face or scalp. Adelman Aff. ¶ 5, A-569. Moreover, Dr. Adelman would have testified that, for Reynolds to have been shot in the scalp while in the position described by Clarke and the others, the gun had to have been fired from the same spot where the adjacent car was parked. *Id*. at ¶ 9, A-570-71. Obviously, this did not occur. Thus, Clarke's testimony could not be true.

42

Third, rather than attack Dr. Catanese, the State's medical examiner, in the heavy-handed, buffoonish, offensive way that he did, Harrison could have used the knowledge Dr. Adelman would have provided him to elicit admissions helpful to the defense: that only one of the wounds was fatal, that the two shots to the face would not have incapacitated Reynolds, and that Reynolds could not have been lying face down when he was shot. In this way, Harrison, aided by a defense expert, could have used the State's own expert to undercut Clarke – the only eyewitness claiming to have seen an unjustified shooting.

Meanwhile, consultation with a defense expert would have significantly assisted Harrison in his presentation of a justification defense. As noted above, Dr. Adelman believed that Reynolds would not have been incapacitated by the two shots that were fired into him from in front and likely would have kept coming towards Swaby. Reynolds' fingerprint on the car window and the smashing of the rear window, in Dr. Adelman's view, were consistent with the struggle described by Swaby in his testimony and were inconsistent with the State's speculation that *Reynolds* fell into the window and broke it. *See* A-461-62 (prosecutor's summation). The angle of entry of the fatal wound to the top of Reynolds' head was, according to Dr. Adelman, consistent with a struggle and inconsistent with Clarke's account of a shot fired while Reynolds was lying face down and motionless.

43

Finally, had Harrison consulted with a defense pathologist, he would have been able to present an "excessive force" defense. Under this defense, if the defendant fired the fatal shot with justification, and then fired additional shots that were not justified but were not a cause of death, he would not be liable for his unjustified use of deadly force. *See People v. Carrera*, 282 A.D.2d 614, 616 (2d Dep't 2001); *People v. Hill*, 226 A.D.2d 309 (1st Dep't 1996). Under such an instruction, the jury could have accepted Clarke's testimony that Swaby fired excessively after Reynolds was incapacitated, or discredited Swaby's explanation about his mental state when he fired the additional shots, and still acquitted him on the ground that the additional, unnecessary shots did not cause Reynolds' death. Had a defense pathologist explained to Harrison that the additional shots were not a cause of death, Harrison (assuming he otherwise was acting reasonably) would have perceived this line of defense, developed it through cross-examination, a defense expert witness, or both, and requested the proper instruction.[5]

In rejecting that Swaby was prejudiced by Harrison's failure to consult with a forensic pathologist, the district court misconstrued and took out of context the

---

[5] As noted above, while the district court held that Harrison did not act unreasonably in failing to request such an instruction on the existing trial record, it did not consider or determine the distinct question of whether Swaby was prejudiced by Harrison's failure to develop the necessary record following the requisite consultation before trial with a defense pathologist or other forensic expert. The state court did not address this issue, which Swaby had raised, *see* CPL § 440.10 Mem. of Law, A-615-16, 632-33, 640-41, either.

trial record as well as Dr. Adelman's affidavit. The court concluded that Dr. Adelman's affidavit in fact was "perfectly consistent" with Clarke's testimony because Dr. Adelman agreed the first two shots were fired while Reynolds was approaching Swaby and that the three additional shots that Clarke described being fired into Reynolds while he lay on the ground "match[ed] the three bullets that Dr. Adelman described as travelling in the same general, left to right direction." SPA-34. However, this is untrue. Dr. Adelman did not conclude that three of Reynolds' wounds occurred while he was lying on the ground. Indeed, he concluded that the fatal shot to the top of Reynolds' head could not have occurred while he was on the ground lying face down as Clarke described, since the shot would have had to have been fired from where the car was parked; more likely, he concluded, that shot was fired during a struggle. Moreover, Dr. Adelman's affidavit *refuted* Clarke's claim that Reynolds was incapacitated by the two shots fired directly towards his face, since they merely caused flesh wounds.

Moreover, the district court's conclusion that Dr. Adelman's affidavit supported rather than contradicted the prosecution's case was based upon its incorrect reconstruction of the trial record concerning the position of Reynolds' head on the pavement. The court wrote: "[W]hat Dr. Adelman and petitioner miss is that the testimony taken as a whole supports a finding that Reynolds was lying on his stomach, with his head facing to the side – that is, lying on his right cheek, rather

45

than nose down." SPA-34. However, not one of the cited transcript references supports the court's interpretation of the testimony. In fact, as we have shown, *see* pp. 10, 14, *supra*, Clarke, corroborated by the other witnesses, testified that Reynolds lay *face down* on the ground after he was shot and fell. Not one witness testified that his head rested on his right cheek and was turned to the left. Even the prosecutor understood the evidence to be that Reynolds was lying face down. *See* pp. 14-15, *supra*. The district court was not entitled to engage in its own reconstruction of the record and to uphold Harrison's conduct based upon a theory that no one perceived, pursued, or testified to at the trial.

This was anything but an "overwhelming" case. Only one eyewitness, Clarke, identified Swaby as the shooter, and he had serious credibility issues going to his underlying honesty and his motive to lie: he had been convicted of felony conspiracy to traffic in stolen automobiles, and his testimony suggesting that Swaby retrieved a gun and came back to the scene conveniently relieved him of blame for allowing the shooter to smuggle a weapon inside the club. The case boiled down to a swearing contest between Clarke, claiming Swaby was the aggressor, and Swaby, who claimed that he acted in self-defense. Particularly in such a single eyewitness case, the failure to consult with an expert whose insights or testimony might assist defense counsel in establishing reasonable doubt will establish prejudice under *Strickland*. *See Bell*, 500 F.3d at 156-57 (habeas relief granted

where medical expert could have assisted defense counsel in challenging the sole eyewitness's ability to make a reliable identification after suffering trauma); *Gersten*, 426 F.3d at 609-10 (petitioner prejudiced because expert could have assisted defense counsel in undermining the credibility of the prosecution's star witness); *Lindstadt*, 239 F.3d at 204 (same result in a one-eyewitness case).

In sum, there is a reasonable probability that the outcome of the trial would have been more favorable to Swaby had Harrison consulted with a forensic expert and utilized the knowledge he would have gained in formulating a defense, cross-examining the State's witnesses, and presenting a defense case. The prejudice element is even more firmly established when Harrison's failure to consult an expert is considered together with his "blunder" in eliciting testimony from Swaby that he used a knife to commit a robbery. The knife testimony discredited Swaby even further than his admission he had been convicted of robbery and established that he had a propensity for arming himself with deadly weapons. It tended to contradict his testimony that he had a gun at Club Callalou solely for defensive reasons because it was a dangerous nightclub located in a bad neighborhood. A-323. Considering that the trial really was a credibility contest between Swaby and Clarke, Harrison's discrediting of his own client was bound to be harmful to the defense. *See, e.g., Wilson*, 570 F.3d at 506-07 (finding prejudice and granting habeas where, in a single eyewitness case, defense counsel elicited or did not object to bad act ev-

idence against his own client); *Mackey*, 148 F. App'x at 366-67 (in self-defense case based on a credibility contest between the defendant and one prosecution witness, defense counsel's failure to request a limiting instruction with regard to the jury's consideration of bad act evidence constituted ineffectiveness).

This Court also should consider, in its prejudice analysis, the various other ways in which Harrison sabotaged his own client. The most egregious example was Harrison's opening statement, which even the district court termed "confusing and rather bizarre." While it may be true that Harrison's intention was to suggest to the jury that Reynolds was the aggressor, he blundered into providing a motive for Swaby to attack Reynolds by claiming, without any factual basis, that Reynolds had flagrantly taunted Swaby about Reynolds' sexual relationship with Swaby's girlfriend Faye Dunn. This put Swaby in the position of having to deny his own lawyer's statement and opened the door for the prosecutor, both in his cross-examination of Swaby and in his summation, to use Harrison's statement to impeach Harrison's own client. The record in the state court was uncontradicted that Swaby never told Harrison that he had been taunted by Reynolds.[6] Thereafter, Harrison's buffoonish cross-examination of the State's witnesses about the same

---

[6] The state court speculated, without any such evidence, that Swaby must have told Harrison about the Reynolds' taunting and then just changed his mind when he took the witness stand. A-730. However, Swaby's denial that this was so in his sworn affidavit was uncontradicted. Harrison told new defense counsel that he could not recall or explain the basis for his remarks. Rudin Affim., ¶ 18(e), A-532.

subject, together with his embarrassing cross-examination of the State's

pathologist Dr. Catanese, further discredited the defense.

## POINT II

**DEFENSE COUNSEL ALSO WAS INEFFECTIVE,
AND PREJUDICED THE DEFENSE, BY FAILING
TO REQUEST A 'FLIGHT' OR CONSCIOUSNESS-
OF-GUILT INSTRUCTION**

Harrison's explanation for his failure to request a consciousness-of-guilt in-

struction potentially negating the flight evidence was that his practice was not to do

so. Rudin Affirm., A-529. The state court determined that his decision in this case

was a reasonable strategy because "generally, it is the People who request a 'flight'

instruction" while "most defense counsel do not want a court to inform the jury

that flight is evidence of consciousness of guilt and evidence that the defendant

committed the crime." A-728. The district court upheld the reasonableness of this

result. However, no reasonable jurist, given the way this case was presented to the

jury, could have concluded that it was reasonable for Harrison *in this case* to re-

frain from requesting a flight instruction. Harrison's omission adds greatly to the

cumulative prejudice his ineffectiveness caused Swaby.

Pursuant to New York's standard Criminal Jury Instructions, jurors are in-

structed that conduct alleged to show consciousness of guilt "may have an innocent

explanation." 1 CJI(NY) 9.16(1) (1983). If jurors "find such an explanation from

the nature of the conduct itself," they "must disregard such evidence *totally*" and "[f]orget" that they heard it.  *Id*. (emphasis in original).  The instructions provide the following example:

> [E]ven an innocent person who finds himself placed under suspicion, may instinctively or protectively resort to conduct which might create the appearance of guilt in order to avoid arrest or criminal prosecution.  Thus, if an innocent purpose may be drawn from the evidence, you must disregard it completely.

*Id*.  Jurors may consider the defendant's conduct "[o]nly if" they find that it was "*solely* motivated by consciousness of guilt."  *Id*. at 9.16(2) (emphasis added).  Furthermore, even if jurors make such a finding, they are still supposed to be instructed that such evidence has "slight value" and may only be considered when accompanied by "other direct and substantial evidence pointing toward the guilt of the defendant."  *Id*.

These instructions are required by Court of Appeals decisions recognizing "the ambiguity of evidence of flight and . . . its weakness as an indication of guilt of the crime charged."  *People v. Yazum*, 13 N.Y.2d 302, 304 (1963) (and cases cited).  Following the Court of Appeals' rule, numerous New York appellate courts have reversed convictions where evidence of the defendant's flight was introduced and the trial court failed to provide any, or the correct, consciousness-of-guilt instruction.  *See, e.g., People v. Baker*, 26 N.Y.2d 169, 174 (1970); *People v. Fioren-*

50

*tino*, 197 N.Y. 560, 567 (1910); *People v. Ali*, 146 A.D.2d 636, 636 (2d Dep't 1989); *People v. Jones*, 104 A.D.2d 826, 827 (2d Dep't 1984); *People v. McKenzie*, 97 A.D.2d 774, 774 (2d Dep't 1983); *People v. Limage*, 57 A.D.2d 906, 906 (2d Dep't 1977); *People v. Valentine*, 45 A.D.2d 1043, 1043 (2d Dep't 1974).

Here, the state court, without citing any case or other authority, made the bald assertion that "generally, it is the People who request a 'flight' instruction and not a defense counsel. Most defense counsel do not want a court to inform the jury that flight is evidence of consciousness of guilt and evidence that the defendant committed the crime." A-728. Nothing in the record of the case supports such a finding. Moreover, the express terms of the jury charge Harrison should have requested do not at all support it.

Rather than favor the prosecution, the charge, as we have shown, requires a jury to *disregard* evidence of flight *totally* if an innocent explanation may be inferred from the conduct, and otherwise to accord such evidence, no matter how much the prosecution has emphasized it, "slight value." Here, there *was* a reasonable explanation for Swaby's flight. He testified:

> I would have stayed but I knew [the victim's] friends was [sic] coming outside. If they came outside and seen me, they'd have killed me. That's the only reason why I left.

51

A-408. He added that he did not surrender himself over the next two months because his attorney would not appear without a further payment that Swaby could not afford and because (as an African-American teenager living in Canarsie, Brooklyn) he was afraid to surrender himself to police on his own. A-416-17. Since there was an innocent explanation for Swaby's flight, the jury would have been required to discount such evidence or, at worst, to accord it "slight" value only.

Moreover, the instruction that Harrison should have requested would not have told the jury anything it did not already know: that the State was relying on Swaby's flight as evidence of his guilt. Absent a limiting instruction, the jury had no reason to suppose it could not consider Swaby's flight heavily against him the way the State was urging it to do. Rather than draw more attention to the damaging evidence that the prosecution already had elicited and argued, a flight charge would have provided a way for the defense to defeat or greatly diminish the State's argument. Regardless of the state court's own view of the utility of a flight instruction generally, there is no reasonable view of the record *in this case* that would justify Harrison's failure to ask for this standard, CJI charge.

It is well established that habeas relief can be granted from a state court conviction when defense counsel has failed to request a limiting instruction with regard to an important piece of evidence against his client. *See, e.g.*, *Musladin v.*

*Lamarque*, 555 F.3d 830, 846-47 (9th Cir. 2009) (during closing argument, prosecutor drew jury's attention to damaging hearsay evidence and invited the jury to draw the negative inference that a limiting instruction would have forbidden); *Albrecht v. Horn*, 485 F.3d 103, 127-28 (3d Cir. 2007) (after prosecutor improperly invited jury to infer the defendant's bad character from evidence of the defendant's bad acts, defense counsel's failure to request a limiting instruction was deficient performance); *White v. McAninch*, 235 F.3d 988, 998 (6th Cir. 2000) (same); *Mackey*, 148 F. App'x at 366-67 (defense counsel not justified in foregoing limiting instruction "to avoid focusing the jury's attention any further on the acts . . . [w]here the jury's attention was already highly focused on the acts at issue").

The three cases cited in the district court's opinion – *Garcia v. Graham*, No. 11-CV-0870, 2012 WL 2921624 (W.D.N.Y. July 17, 2012); *Thompson v. Lemke*, No. 08-CV-3426, 2009 WL 4110290 (E.D.N.Y. Nov. 23, 2009); and *Robinson v. Keane*, No. 08-CV-3426, 1999 WL 459811 (S.D.N.Y. June 29, 1999) – are inapplicable. In those cases, the district courts reasoned that a consciousness-of-guilt instruction might have drawn undue attention to the petitioners' flight, which – unlike this case – was not a central theme of the prosecution. *See Garcia*, 2012 WL 2921624, at *10 (prosecutor made merely "two passing references" to flight in his closing statement); *Thompson*, 2009 WL 4110290, at *12 (speculating that the defense "sought not to remind the jury that petitioner had left the state"); *Robinson*,

53

1999 WL 459811, at *2-3 (a consciousness-of-guilt instruction "may well have harmed petitioner more than it would have helped him" because it would have "highlighted evidence that the petitioner fled immediately after the crime was committed"). In the present case, the State *already* had squarely focused the jury's attention on Swaby's flight, which Harrison obviously recognized when he addressed the issue in Swaby's direct examination and during his summation. If it was not so clearly prejudicial to a defendant for a court to fail to give such an instruction in a case in which the flight issue was significant, New York's appellate courts would not have reversed so many convictions for courts' failure to give the instruction upon request.

The state court did not consider the prejudicial effect under the facts of this case of Harrison's failure to request a flight charge, having determined the omission was not error at all. Thus, there should be no AEDPA deference on the prejudice issue. Especially when considered cumulatively with Harrison's other errors, his failure was prejudicial under *Strickland*. By omitting to request the standard New York consciousness-of-guilt jury instruction, Harrison's performance fell below an objective standard of reasonableness. There was no reasonable trial strategy to support Harrison's failure to request a limiting instruction. The error, independently or considered cumulatively with Harrison's other errors, was highly

prejudicial. Whether considered *de novo* or under AEDPA, Harrison's error in this respect satisfies the *Strickland* prejudice prong.

## <u>CONCLUSION</u>

The district court took *eight years* to adjudicate Swaby's habeas corpus petition, notwithstanding Swaby's repeated requests for attention to his case and the habeas statute's requirement that such petitions be determined promptly. It correctly found that Swaby's trial counsel engaged in behavior that no reasonable state court could possibly excuse, but rejected that Swaby was prejudiced based upon a clear misreading of the state trial record. Jermaine Swaby may, or may not, have acted reasonably in his own defense, but this trial was not a fair measure of his culpability. A conditional writ should be granted, affording the State 60 days to retry Swaby or else to release him from custody.

Respectfully submitted,

_/s/ Joel Rudin_____
JOEL B. RUDIN (JR-5645)
Law Offices of Joel B. Rudin
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 752-7600
jbrudin@rudinlaw.com

*Attorney for Appellant Jermaine Swaby*

DATED:    New York, New York
              October 10, 2014

55

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

### Certificate of Compliance With Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

   [X ]  this brief contains 12,823 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), or

   [ ]  this brief uses a monospaced typeface and contains <state the number of> lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   [X ]  this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2007 in Times New Roman, 14-point font, *or*

   [ ]  this brief has been prepared in a monospaced typeface using <state name and version of word processing program> with <state number of characters per inch and name of type style>.

Date:  October 10, 2014

    */s/* Joel Rudin
Joel B. Rudin
Attorney for Jermaine Swaby
Law Offices of Joel B. Rudin
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 752-7600
jbrudin@rudinlaw.com

**SPECIAL APPENDIX**

i

# Table of Contents

**Page**

Memorandum and Order of the Honorable Eric N. Vitaliano,
Dated March 25, 2014, Appealed From .................................. SPA-1

Judgment, Dated April 7, 2014. Appealed From ........................ SPA-40

SPA-1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------x
: 
JERMAINE SWABY, :
:     **MEMORANDUM & ORDER**
                      **Petitioner,** :
:     **06-CV-3845 (ENV)**
    **-against-** :
:
THE PEOPLE OF THE STATE OF NEW :
YORK, :
:
                    **Respondent.** :
-------------------------------------------------------x

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ MAR 3 1 2014 ★
BROOKLYN OFFICE

VITALIANO, D.J.

    In the early morning hours of September 30, 2001, Shane Reynolds exited a

night club in Brooklyn.  Moments later, Jermaine Swaby, using a firearm he was

carrying illegally, shot Reynolds in the head five times, killing him.  At his state

court murder trial, Swaby acknowledged these facts, but claimed he acted in self

defense.  The jury did not buy that story, and convicted him of intentional murder.

    Swaby is now before this Court, represented by an attorney, on a petition for

a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, asserting that the state court

proceedings violated his Sixth Amendment right to the effective assistance of

counsel.

    For the reasons set forth below, the Court finds that certain of the state court

findings were unreasonable or contrary to clearly established federal law, but finds

that petitioner cannot demonstrate the existence of a reasonable probability that,

1

SPA-2

but for defense counsel's deficient performance, the result of his trial would have been different.  In sum, the shortcomings do not upset confidence in the verdict or render the conviction constitutionally infirm.  The writ must be denied and the petition dismissed.

<u>Background</u>

A. <u>The Case Theories</u>

Swaby's jury trial took place in Kings County before Justice Albert Tomei[1] in May 2002.  (Transcript of Record, <u>People v. Swaby</u>, Indict. No. 9142/01 (Sup. Ct., Kings Cty., 2002) ("Tr.") at 1.)  The prosecutor advanced a relatively simple theory in his opening statement:  Swaby executed Reynolds outside a nightclub following an altercation that began inside the club.  The People argued that the evidence would show (1) Swaby and Reynolds knew and had issues with each other prior to the shooting; (2) Swaby, Reynolds, and others engaged in a fistfight in the early morning hours of September 30, 2001 while at Club C, a nightclub in Brooklyn; (3) bouncers threw Swaby out of the club as a result of the fight; (4) after being ejected, Swaby initially left the area of the club but returned and waited for Reynolds near the club's entrance; and (5) upon Reynolds's exit from Club C, Swaby shot him in the head multiple times.  The prosecution argued further that it would demonstrate that, shortly before Reynolds exited the club, Swaby's girlfriend, Faye Dunn yelled, "Bring him out, bring him out.  Bring that motherfucker out,"

---

[1] Because Swaby was convicted, the Court recites the facts in the light most favorable to the verdict.  <u>See</u> <u>Garbutt v. Conway</u>, 688 F.3d 79, 80 (2d Cir. 2012).

and, upon Reynolds's exit, shouted, "Shoot him, shoot him." Finally, the People explained that a bouncer at the club, Wayne Clarke, who had no connection to Swaby or Reynolds, would testify that he (1) saw Swaby exit the club and then immediately leave the area; (2) saw Reynolds leave the club shortly thereafter; (3) heard two shots fired while he stood only a few feet away from Reynolds; and (4) upon turning toward the direction from which he heard the shots come, he saw Swaby fire a second fusillade of shots toward Reynolds as he lay motionless on the ground.

Knowing that he could not contest that his client was the shooter, in the defense opening, Swaby's trial counsel, Michael Harrison, offered a confusing and rather bizarre statement. Giving counsel every benefit of the doubt, however, it does appear that he introduced a theory of self defense.

## B. The People's Case

Police Officer Avis Whittle, the first witness, described the crime scene. (Tr. 38–54.) He explained that the night club's entrance was located 20 to 30 feet from a gate that was near a sidewalk running along a street lined with parked cars. Additionally, he testified that Reynolds's body was found lying on that sidewalk, with his legs directed toward the club and his head hanging off the curb, facing a nearby parked car. (Tr. 53.)

Sharaka Cuyler, Reynolds's girlfriend at the time of the shooting, testified that she went with Reynolds and others to Club C where she saw that Swaby and his

3

girlfriend, Faye Dunn (also known as "Janelle"). (Tr. 246, 341.) Cuyler told the jury that she saw a fight break out at the club that involved Swaby and Reynolds, among others. (Tr. 70–74.) When Cuyler and Reynolds attempted to exit the club, a bouncer pushed Reynolds outside, pushed Cuyler back inside, and closed the door. From inside the club, Cuyler heard about six gun shots and a voice she recognized as Dunn's yelling, "Pop that nigger." (Tr. 80–81.) Soon after, Cuyler was able to get outside where she saw Reynolds lying with his head by the curb, bleeding, and trying to speak. (Tr. 84–85.) On cross examination, Harrison attempted to establish that Reynolds must have "pursued or followed" Swaby outside the club. The only testimony he was able to elicit on this point, however, was that Reynolds left the club after Swaby. (Tr. 88–89; see also 97, 99.)

The People's third witness was Jamar Carr, a friend of Reynolds. (Tr. 101–50.) Carr testified that he met Reynolds and others at the club on the night of the shooting. He stated that he saw a fight break out involving Dunn, Swaby, Reynolds and others inside the club. When Carr left the club, he saw Reynolds standing outside on the sidewalk. (Tr. 122.) He then heard Dunn say, "Pop him. Pop him," followed by one gunshot, a pause, and then four or five more shots. (Tr. 124–25.) When the shots stopped, Carr saw Reynolds lying on the sidewalk by a car, trying to speak. (Tr. 128.)

Wayne Clarke, a bouncer at the club, was the prosecutor's fourth witness. (Tr. 156–202.) He testified that, at around 4:30 A.M., he saw two men leave the

4

club. The first man, who Clarke recognized as a regular customer, said that people were fighting and that he was "getting the hell out of [t]here." The second man, who Clarke later identified as Swaby, was, at that point in time, unknown to Clarke, and said nothing. The two men left the area. (Tr. 168.)

Clarke then walked through the gate toward the club's entrance, he told the jury, to see what was going on. As he did, he heard a woman's voice yell from inside the club's entrance, "Bring him out. Bring the mother fucker out." (Tr. 169.) As the woman reached the top of a staircase leading to the club's entrance, the woman, who he later identified as Dunn, came into view. She left the area in front of the club, passing Clarke, and yelling, "I want that mother fucker. Clap him. Clap him. I want him dead." (Tr. 171.) At that point, Clarke noticed that Swaby had returned, and was sitting on a car located about five feet from the gate. Swaby said nothing to Dunn as she approached him, but he moved toward her and motioned to her by extending both arms with his palms outstretched.

At that point, Clarke "figured something was going to happen," and turned around to tell his colleagues inside. As he continued toward the club's entrance, Reynolds came out of the club, and exclaimed, "Fuck with me, son" while reaching out both of his (empty) hands. (Tr. 176.) A "split second" later, Clarke heard a gunshot. (Tr. 177.) He did not see who fired the shot, but turned toward the direction from which it had come. It was then that he saw Swaby fire a second shot at Reynolds and Reynolds fall forward, with his face landing by the curb, away

5

from Clarke. Swaby stood over Reynolds and fired four to six additional shots toward Reynolds's motionless body. Clarke, who was standing near the gate, was about seven or eight feet away from Reynolds when these last shots were fired. In fear, he retreated into the club. (Tr. 176–84.) Harrison's cross-examination of Clarke elicited no helpful testimony for the defense. (Tr. 194–202.)

The prosecution also introduced forensic evidence and related testimony. First, seven shell casings were collected at the scene, each of which was fired from the same 0.22 caliber semiautomatic gun, which, an expert testified, would fire only one bullet per trigger pull. (Tr. 211, 278, 282.) Second, Reynolds's fingerprint was found on the front passenger side window of the car parked near where he fell. (Tr. 222–25.) And third, the car's rear side window was broken. (Tr. 226.)

Finally, the People called Dr. Charles A. Catanese, the medical examiner who performed an autopsy on Reynolds. (Tr. 287–318.) He testified that Reynolds's cause of death was catastrophic head trauma resulting from five gunshots wounds to the head. Dr. Catanese further testified that Reynolds had the following injuries in addition to his bullet wounds: (1) an abrasion on the lower, right chin; (2) an abrasion and a bruise on the right side of his forehead; (3) a contusion around his right eye; (4) a laceration on his nose; (5) multiple abrasions around his right eye; (6) a linear abrasion on his left cheek; and (7) about 45 abrasions on his left hand and forearm, consistent with stippling that occurs from gun fire. (Tr. 300–05.) Finally, Dr. Catanese testified that Reynolds had a blood alcohol level of 0.06. (Tr.

6

306.)  Again, Harrison's cross-examination did not elicit any helpful testimony for the defense.  (Tr. 308–315.)

C. The Defense Case

Swaby was the only defense witness.  According to his testimony, Swaby did not even know Reynolds prior to the night of the shooting.  He testified that he carried a gun into the club because he lived in "a bad neighborhood [where] people get killed all the time." (Tr. 322.)  Before that night, however, he had never fired it. He did admit, in response to a question from Harrison, that he used a knife to rob someone in the recent past, and that he pled guilty to that crime.  (Tr. 322–33.) Swaby testified that on the night of the shooting he was dancing at the club when "some guy" he did not know approached him and punched him in the face for no apparent reason.  Then, "quite a few" other people started hitting him as well, at which point, he left the club.  As Swaby was waiting outside for Dunn, he saw Reynolds run at him with one hand behind his back.  Reynolds ran into Swaby, smashing him against the car.  According to Swaby, a struggle ensued.  He could not run away, he said, because he was pinned against a car.  Swaby's description of the altercation during his direct testimony ended with Swaby stating that he had no memory of the shooting because he "blacked out." (Tr. 332.)

On cross examination, Swaby reiterated that he could not remember the shooting at all because he closed his eyes and blacked out.  (Tr. 398.)  Several answers later, however, he described pulling the gun's trigger and then blacking

7

out.  (Tr. 401.)  And then, several more answers later, he noted, "I only had to pull it one time.  It just went crazy, just kept going off."  (Tr. 404.)  Swaby explained that he was not aiming the gun in any particular direction and it was just a coincidence that all five bullets hit Reynolds in the head.  (Tr. 404–05.)

There was a redirect of a sort.  Harrison presented a role playing exercise in which Swaby and Harrison acted out the fight.  At the start of the exercise, Harrison played Swaby and Swaby played Reynolds.  Later, they switched roles.  The exercise was apparently confusing to the trial judge (and, presumably, the jury), with the judge indicating that he could not determine who was playing whom.  (Tr. 417.)

D. The Closing Statements

In summing up for the defense, Harrison argued that the shooting was justified on the basis of self defense.  He stated that Swaby was "attacked by a group of people [inside the club] who appeared to be part of Mr. Reynolds' group or predatory gang."  (Tr. 425.)  He argued that forensic evidence, specifically, Reynolds's fingerprint on the car, corroborated Swaby's story that the two had been in a fight outside the club and that Reynolds had pinned Swaby against the car.  (Tr. 429.)  He also continually emphasized the fact that Swaby had "retreat[ed]" from the club.  (See, e.g., Tr. 439.)  At climax, Harrison sought to reference a David and Goliath analogy that he used in his opening statement, but the prosecutor objected and Harrison ended his summation.  (Tr. 450.)

8

SPA-9

The prosecution closed emphasizing that Swaby admitted to shooting Reynolds, and argued that even if the jury believed Swaby's version of events, they should conclude that Swaby, nevertheless, was not acting in self defense. (See, e.g., Tr. 459.) The People also repeatedly pointed out that the physical evidence corroborated Clarke's version of the incident. (See, e.g., id.) The prosecutor argued, succinctly, that "the only reasonable view of the evidence is that [Swaby] murdered [] Reynolds." (Tr. 470.)

E. The Charge, Jury Deliberations, Verdict and Sentencing

The only jury instruction Harrison requested was justification, and it was provided. (Tr. 420.) Harrison declined to request any lesser-included charges, nor did the trial judge deem such instruction appropriate in his proposed charge. (Tr. 420–21.) The jury found Swaby guilty of intentional murder in the second degree under New York Penal Law § 125.25[1]. (Tr. 502.) The trial court sentenced Swaby to a term of 25 years to life imprisonment. (Sent. Tr. 15.)

F. Post Trial Proceedings

Swaby appealed his conviction to the Appellate Division, Second Department, arguing that the trial court's justification charge was erroneous. On, June 21, 2004, the Second Department held that Swaby's claim was unpreserved and, in any event, without merit. People v. Swaby, 8 A.D.3d 591, 778 N.Y.S.2d 711 (2d Dep't 2004). On August 27, 2004, New York's high court denied leave to appeal. People v. Swaby, 3 N.Y.3d 682 (2004).

9

On October 14, 2005, Swaby moved to vacate his conviction pursuant to New York Criminal Procedure Law ("C.P.L.") § 440.10, contending that his right to effective assistance of counsel had been violated. See People v. Swaby, Ind. No. 9142/01, Memorandum (Sup. Ct., Kings Cty., March 23, 2006). That motion was denied on March 23, 2006. Id. The Appellate Division denied leave to appeal on July 11, 2006. People v. Swaby, Ind. No. 9142/01, Dec. & Order on App. (2d Dep't 2006). Swaby's counsel for the purposes of his § 440.10 motion was Joel B. Rudin, who is also representing Swaby before this Court.

Swaby filed the instant petition for habeas corpus relief on August 9, 2006. Swaby's only claim is that his trial counsel, Harrison, was constitutionally ineffective. He offers many arguments in support of that claim.

## Legal Standards

### A. Substantive Grounds for Habeas Review

Under the Antiterrorism and Effective Death Penalty Act, Pub. L. No. 104-132, 110 Stat. 1214 (1996) ("AEDPA"), a writ of habeas corpus shall not issue with respect to any claim that was adjudicated on the merits in state court unless the state court's decision (1) "was contrary to," or involved an unreasonable application of, "clearly established federal law" as determined by the United States Supreme Court, or, (2) "was based on an unreasonable determination of the facts" in light of the evidence presented. 28 U.S.C. § 2254(d); see also Gutierrez v. McGinnis, 389 F.3d 300, 304 (2d Cir. 2004) (describing this standard as "AEDPA deference").

10

AEDPA's deferential review applies whenever a state court disposes of a state prisoner's federal claim on the merits, regardless of whether it gives reasons for its determination or refers to federal law in its decision. Harrington v. Richter, 131 S. Ct. 770, 785 (2011); see also Sellan v. Kuhlman, 261 F.3d 303, 312 (2d Cir. 2001). "Section 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." Harrington, 131 S. Ct. at 786 (2011) (quoting Jackson v. Virginia, 443 U.S. 307, 332 n. 5 (1979)). Review under AEDPA "demands that state-court decisions be given the benefit of the doubt." Hardy v. Cross, 132 S. Ct. 490, 491 (2011) (per curium) (internal quotation marks omitted). Where AEDPA deference applies, "a state court's findings of fact are 'presumed to be correct' unless rebutted 'by clear and convincing evidence.'" Drake v. Portuondo, 553 F.3d 230, 239 (2d Cir. 2009) (quoting 28 U.S.C. § 2254(e)(1)).

For the purposes of federal habeas review, "clearly established federal law" refers to the holdings, as opposed to dicta, of Supreme Court decisions in effect at the time of the relevant state court decision. Williams v. Taylor, 529 U.S. 362, 412 (2000). A state court decision is "contrary to clearly established federal law" within the meaning of § 2254(d) if it contradicts relevant Supreme Court precedent or arrives at a different conclusion based on "materially indistinguishable" facts. Id. at 405–06. A state court decision involves an "unreasonable application" of federal law if it "identifies the correct governing legal principle from [the Supreme] Court's

11

SPA-12

decisions but unreasonably applies that principle of the facts of" the case. Id. at 413. In construing and applying federal law, even erroneous state court decisions, if deemed reasonable, will survive habeas review. Id. at 411. The state court decision need not be "so far off the mark as to suggest judicial incompetence" before habeas relief may be granted. Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000) (internal quotation marks omitted). However, a federal court may reverse a state court ruling only where it was "so lacking in justification that there [is no] possibility for fairminded disagreement." Vega v. Walsh, 669 F.3d 123 (2d Cir. 2012) (quoting Harrington, 131 S. Ct. at 786–87). "If this standard is difficult to meet—and it is— that is because it was meant to be." Burt v. Titlow, 134 S. Ct. 10, 16 (2013) (internal quotation marks omitted). Federal courts should not "lightly conclude that a State's criminal justice system has experienced the 'extreme malfunctio[n]' for which federal habeas review is the remedy." Id. (citation omitted).

Moreover, review under § 2254(d) is "limited to the record that was before the state court that adjudicated the claim on the merits." Pinholster, 131 S. Ct. at 1398. A federal court may look beyond the state court record, however, when the petitioner can demonstrate that "the adjudication of his claim based on the state-court record resulted in a decision 'contrary to' or 'involving an unreasonable application' of federal law." Id. at 1411 n. 20.

12

B. **Ineffective Assistance of Counsel**

Strickland v. Washington provides the well-known, two prong framework for analyzing ineffective assistance of counsel claims.  466 U.S. 668 (1984).  First, a petitioner must overcome the strong presumption that his trial counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment" by showing that his counsel failed to act "reasonabl[y] considering all the circumstances."  Pinholster, 131 S. Ct. at 1404 (quoting Strickland, 466 U.S. at 690, 688).  Second, the petitioner must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland, 466 U.S. at 694.  The "reasonable probability" standard "requires a 'substantial,' not just 'conceivable,' likelihood of a different result."  Pinholster, 131 S. Ct. at 1404 (quoting Harrington, 131 S. Ct. at 791).  Because of the inherently deferential nature of the Strickland standard, "[a] criminal defendant has a high burden to overcome to prove the [constitutional] deficiency of counsel."  Lynn v. Bliden, 443 F.3d 238, 247 (2d Cir. 2006).  For habeas petitioners, this burden is "enhanced by the hurdle posed by the highly deferential review accorded state court adjudications under [AEDPA]."  Mosby v. Senkowski, 470 F.3d 515, 519 (2d Cir. 2006) (quoting Eze v. Senkowski, 321 F.3d 110, 112 (2d Cir. 2003)).  In other words, the benchmark for ineffective assistance claims in the habeas context is "doubly deferential" because courts take a "highly deferential look at counsel's performance through the deferential lens of

13

§ 2254(d)." Pinholster, 131 S. Ct. at 1403 (citations omitted).  To succeed in district court on any issues where AEDPA deference is required, the petitioner will have to show "that it was necessarily unreasonable" for the state court to conclude that the petitioner did not prove his trial attorney was ineffective.  Id. at 1404.

## Discussion

### A. Counsel's Alleged Failure to Request Necessary Jury Instructions

#### 1) Failure to Request a Flight Charge

Petitioner contends that Harrison's failure to request a flight instruction constituted ineffective assistance.  (Petitioner's Memorandum of Law in Support of the Petition, filed on March 5, 2007 ("Pet. Mem."), 30–32.)  The § 440.10 motion court rejected this argument after noting that the decision to request a flight instruction is a matter of trial strategy.  People v. Swaby, Memorandum, at 13.

Under New York law, criminal defendants are entitled to a jury instruction, upon request, that evidence of flight as consciousness of guilt is of limited probative value whenever such evidence is introduced at trial.  People v. Yazum, 13 N.Y.2d 302, 304, 246 N.Y.S.2d 626 (1963).  Since it is clear that evidence of Swaby's flight was introduced at his trial (see, e.g., Tr. 340–49, 467), it would not have been error for the trial court to give the instruction.  That being so, this Court must address whether Harrison's failure to request such a charge was a reasonable trial strategy under the circumstances.

14

As courts in this circuit have observed, a flight instruction, "while pointing out to the jury the limited probative value of flight evidence, [also reveals to the jury that flight can be considered] as evidence of the defendant's own 'consciousness of guilt.'"  Garcia v. Graham, No. 11-CV-0870, 2012 WL 2921624, at *10 (W.D.N.Y. July 17, 2012); see also Thompson v. Lemke, No. 08-CV-3426, 2009 WL 4110290, at *12 (E.D.N.Y. Nov. 23, 2009); Robinson v. Keane, No. 92-CV-6090, 1999 WL 459811, at *3 (S.D.N.Y. June 29, 1999).  Particularly in the circumstances presented here, where the innocence of Swaby's mental state was critical to the defense case, it would be entirely reasonable for counsel to conclude that the benefits of a flight charge are far outweighed by the potential downside—disclosing to the jury the fact that flight evidence can be probative, albeit only slightly, of a defendant's guilty conscience.

Because the Court finds that petitioner has failed to show that the state court acted contrary to, or unreasonably applied, clearly established federal law in concluding that Harrison's decision not to request a flight charge was a reasonable trial strategy, petitioner's application for habeas relief on this ground is denied.

   2)  Failure to Request a Lesser Included Offense Instruction

Swaby next argues that Harrison was ineffective for not requesting an instruction on lesser included offenses and, more fundamentally, for failing to explain the law of lesser included offenses to him.  (Pet. 9–10; Pet. Mem. 32–38.) Supreme Court, in deciding his § 440.10 motion, concluded that Swaby failed to

15

demonstrate that he would have been entitled to a lesser included charge, and that, even if the facts supported a lesser included offense charge, an attorney's decision to make such a request is strategic. People v. Swaby, Memorandum, at 12–13.

Under New York law, in order for a court to charge lesser included offenses, there must be a reasonable view of the evidence that would allow the jury to conclude that the defendant committed the lesser but not the greater offense. See N.Y. Crim. Proc. L. § 300.50(1); People v. Scarborough, 402 N.E.2d 1127, 1129–30 (1980); see also Colon v. Smith, 723 F. Supp. 1003, 1007–08 (S.D.N.Y. 1989). Post trial, Swaby claims that he was entitled to instructions on both manslaughter in the first degree based on an intent to cause serious physical injury, N.Y. Penal L. § 125.20[1], and manslaughter in the second degree based on recklessly causing the death of another, N.Y. Penal L. § 125.20[2]. (Pet. Mem. 33.) In any event, since the motion court concluded that there is no reasonable view of the evidence to justify either lesser included charge, its finding that counsel's decision not to request such a charge cannot be deemed ineffective assistance must stand, because its factual findings on this point are not unreasonable nor challenged by any evidence to the contrary. These findings and conclusions of the motion court are impervious to attack under AEDPA's bounds.

Moreover, even if it would have been proper as a matter of state law for the trial court to charge on the lesser included offenses in Swaby's case, as the motion court correctly observed, courts afford "substantial deference" to an attorney's

16

"tactical decision" to not request that the jury be instructed on a lesser included offense. Rios v. United States, No. 91-CV-04384, 1992 WL 328931, at *6 (E.D.N.Y. Oct. 13, 1992). Particularly in a case such as this, in which counsel is pursuing an exculpatory defense, courts have declined to find ineffective assistance of counsel, recognizing that "[t]he tactical decision to pursue a complete, exculpatory defense rather than a partial one enjoys substantial deference." Id. at *6–7; see also Hernandez v. Larkin, No. 12-CV-8090, 2013 WL 4453316, at *15 (S.D.N.Y. Aug. 19, 2013); Gibbs v. Donnelly, 673 F. Supp. 2d 121, 143 (W.D.N.Y. 2009), aff'd, 402 F. App'x 566 (2d Cir. 2010). Without a quibble, it is plain that an instruction that would give the jury an opportunity to consider a mental state other than fear would not have been helpful to Swaby's theory of self-defense.

Lastly, petitioner attempts to distinguish his case based on Harrison's alleged failure to explain the law of lesser included offenses to him. (Pet. Mem. 35–36.) In support of this argument, petitioner offers the sworn statement of his current counsel in the "Rudin Affadavit," which declares that Harrison told Rudin that he could not remember discussing lesser-included charges with Swaby. (Pet. A-5.) The record, however, does not support this contention. When the trial court asked Harrison, "[Y]ou don't want any lesser included?" Harrison responded, "I considered it with my client. The only lesser included would be extreme emotional distress." (Tr. 421–22.) The motion court, in any case, was not obligated to accept Harrison's indirectly-reported, post-conviction failure of recollection over his

17

statement on the record at trial.  But, far more importantly, even if petitioner's claim that Harrison did not consult with him concerning the tactical decision not to seek a lesser included offense instruction were true, courts have concluded that this does not constitute a violation of a petitioner's rights that would entitle him to habeas relief.  See Domingo v. Greiner, No. 99-CV-1906, 2002 WL 362761, at *2 (S.D.N.Y. Mar. 5, 2002) (citing Wainwright v. Sykes, 433 U.S. 72, 93 (1977)).

Because petitioner's argument cannot survive the deficient performance prong of Strickland, the motion court's decision on this claim handily withstands AEDPA review.

### 3) Failure to Request an Excessive Force Instruction

Petitioner next argues that trial counsel was ineffective for failing to request an excessive force charge.  (Pet. Mem. 38–41.)  In its § 440.10 decision, Supreme Court concluded that, to the contrary, trial counsel's apparent decision not to request such an instruction was a reasonable trial strategy.  People v. Swaby, Memorandum, at 13–14.

New York courts have held that "[w]here homicide is charged," and there is evidence that the defendant was initially justified in using deadly force, "the People must prove that it was the excessive force which caused death." People v. Carrera, 282 A.D.2d 614, 616, 725 N.Y.S.2d 344 (2d Dep't 2001).  In Swaby's case, Harrison was not ineffective in failing to request an excessive force instruction because, as petitioner himself admits (Pet. Mem. 40), there was no basis for such a request given

18

the forensic evidence and testimony presented at Swaby's trial.  See Cheeseboro v. Cunningham, No. 09-CV-3262, 2012 WL 1117494, at *7 (E.D.N.Y. March 30, 2012); Darden v. Conway, No. 10-CV-0570, 2011 WL 3739551, at *4–6 (W.D.N.Y. Aug. 24, 2011).  By force of logic, petitioner's application for habeas relief based on Harrison's failure to request an excessive force instruction, in the undisputed absence of record evidence to support such an instruction, is denied.

**B. Counsel's Alleged Failure to Adequately Interview and Prepare Swaby To Testify**

Swaby contends that, but for a preliminary interview several months before trial, Harrison "never interviewed [him] in any detail about the shooting or [his] state of mind, never discussed [] the specifics of [his] defense, and never explained the legal principles underlying a justification defense." (Pet. Mem. 9–10.)  Swaby argues that this is evidenced by (1) Harrison's introduction of an attempted extreme emotion distress ("EED") defense and related references to a sexual relationship between Reynolds and Dunn; (2) his failure to elicit the innocent reasons for Swaby's flight; (3) his failure to introduce evidence about Swaby's past exposure to violence to support the theory of self defense; and (4) his failure to prepare Swaby for an in-court demonstration of Swaby's altercation with Reynolds.  The motion court examined the merits of these claims and concluded that they were contradicted by the record.  People v. Swaby, Memorandum, at 5, 7.  The court stated:  "It is clear from the former defense counsel's voir dire, opening statement and questioning of the defendant during his testimony that the defendant's

19

allegation that counsel only prepared him once (a long time before he testified) is false and unworthy of belief." Id. at 5. Petitioner claims that this determination was unreasonable and contrary to clearly established federal law. (Pet. Mem. 10.)

1) The EED Defense and Relationship Between Reynolds and Dunn

Swaby's first parry misconstrues Harrison's opening statement and then attacks that misconstruction. Petitioner contends that Harrison argued that Swaby was acting under an extreme emotional disturbance caused by his knowledge of Reynolds's alleged impregnation of Dunn. Swaby embellishes this argument by proffering that it was presented to the jury by Harrison as a result of his failure to adequately consult with Swaby whereupon he would have discovered that, in fact, Swaby had no such knowledge. The record, however, shows, and the motion court correctly found, that the "only defense [Harrison] pursued was justification." People v. Swaby, Memorandum, at 6. Viewing the record in its entirety, Harrison's use of the Dunn-Reynolds relationship was not meant to bolster an argument that Swaby acted under emotional distress, but, rather, was a factually-supported trial strategy meant to demonstrate that Reynolds was antagonistic and intent on attacking Swaby. More to the point, the motion court's ruling to that effect was reasonable. Supreme Court's finding can only be upset by clear and convincing evidence. Petitioner offers none.

2) Failure to Elicit Innocent Reasons for Swaby's Flight

20

Next under the spotlight is the claim that Harrison failed to interview Swaby to learn the true reasons for his flight, and failed to prepare him to testify about why he fled the scene of the shooting and then avoided the police.  These reasons included "his fear of the Crips gang in prison" (Swaby claimed to have believed that Reynolds was a member of that gang), "his fear of excessive force at the hands of the police," and "his fear that he would not be accorded justice once arrested." (Pet. Mem. 20–21.)  The § 440.10 court concluded, generally, that "[i]t is clear from former defense counsel's voir dire, opening statement and questioning of the defendant during his testimony that the defendant's allegation that counsel only prepared him once (a long time before he testified) is false and unworthy of belief." On the issue of Swaby's alleged fear of the "Crips," the § 440.10 court reasoned that Swaby had an opportunity to bring up the fact that he knew Reynolds was in a gang, if, in fact, that was what he believed.  Since he did not, the motion court determined that Swaby's claim that he believed Reynolds was in a gang was "contradicted by the record and false." People v. Swaby, Memorandum, at 5–6.

Despite petitioner's assertions, Harrison did, in fact, elicit testimony from Swaby that (1) the reason he left the crime scene was that he knew Reynolds's friends would be coming out of the club and would try to kill him if he stayed; and (2) he did not call 911 after he left the scene and, instead, threw the gun away, because he was still scared.  (Tr. 407.)  Swaby also explained, in response to Harrison's questioning, that he contacted a lawyer and arranged to turn himself in

21

**SPA-22**

to the police shortly after the shooting, but when the lawyer demanded more money, and Swaby and his family could not afford to pay him, the plan fell through. (Tr. 334–35.) Swaby explained during cross-examination that he did not want to turn himself in to the police without a lawyer because he was afraid the police would beat him up. (Tr. 348.)

Because the § 440.10 court's determination was based on its reasoned reading of the trial record, AEDPA requires deference to its determination that this claim is meritless.

### 3) Failure to Introduce Evidence About Swaby's Past Exposure to Violence

Changing the subject matter, petitioner contends that Harrison was ineffective for failing to adequately support his justification theory by discovering and introducing evidence that Swaby's prior exposure to violence provided a reasonable basis for him to believe that Reynolds posed a deadly threat. These past experiences include "Swaby's exposure to a brutal murder as a child, his having been stabbed on two occasions, the murder of one of his friends, his presence at the attempted murder of an acquaintance, his knowledge of the dangerous reputation of Club Callaloo and its environs, and his belief that Reynolds was in the deadly Crips gang." (Pet. Mem. 15.)

Under New York law, a defendant's prior exposure to violence may contribute to his subjective belief that he is facing the imminent use of deadly force against him and may provide an objective basis for him to conclude that he must use

22

deadly physical force in his self-defense. See People v. Wesley, 76 N.Y.2d 555, 559, 561 N.Y.S.2d 707 (1990). Yet, it cannot be said that defense counsel failed entirely to support the justification defense. For example, Swaby testified, in response to Harrison's questions, that he saw Reynolds "reaching for something" "behind his back" (Tr. 327, 396, 400; Pet. Mem. 18), and that Reynolds "seemed angry, may have been intoxicated, and pushed Swaby up against a car." (Pet. Mem. 18.) Moreover, Harrison questioned Swaby about why he had a gun, and Swaby testified that he carried it because he lived in a "bad neighborhood [where] people get killed all the time." (Tr. 322; Pet. Mem. 18.) Contrary to petitioner's contention, this testimony confirms that Swaby had previous experience with violence, but also that Harrison was aware of it, and used the information to Swaby's advantage at trial. In essence, Harrison chose to meld the evidence of Swaby's exposure to violence into the greater argument about justification, apparently as petitioner agrees it should have been done. The point of contention now is that Harrison should have gathered and used more violent episodes involving Swaby to leverage their contributions to Swaby's subjective belief that he needed to use deadly force against Reynolds.

Again, it is an uncontroversial argument on this record, not that Harrison omitted a strategy, but that he could have done more to support it. However, that is not the test for granting an application for a federal habeas writ. The purpose of habeas review is not to substitute and/or layer on this Court's judgment for that of defense counsel in determining the amount and type of evidence that should be

23

presented at trial. Counsel saw no good purpose in adding to what he had. The motion court concluded that, based on the record and a totality of the circumstances analysis, defense counsel elicited adequate evidentiary support for his justification theory, including Swaby's exposure to violence. Supreme Court's conclusion is not unreasonable, nor is it contrary to clearly established federal law. AEDPA, as a consequence, does not tolerate its set-aside.

    4) The Physical Reenactment at Trial

    Petitioner argues that Harrison's staging a physical reenactment of the confrontation between Swaby and Reynolds, without adequately preparing Swaby beforehand, rendered his assistance constitutionally ineffective. (Pet. Mem. 22.) However, even if Harrison did not prepare Swaby for the physical reenactment, the reenactment occurred on redirect, as the motion court correctly pointed out. People v. Swaby, Memorandum, at 17 n. 54. In other words, Harrison made a spur-of-the-moment, strategic decision that the reenactment was necessary to respond to what occurred during Swaby's cross-examination by the prosecutor. Such mid-trial decisions by counsel are not properly second-guessed by federal courts on habeas review. And, more importantly, the motion court's conclusion on this point was reasonable. Accordingly, petitioner's application for habeas relief in connection with the in-trial physical reenactment based on Harrison's failure to adequately interview and prepare him is denied.

C. Counsel's Allegedly Bizarre and Harmful Comments and Conduct

SPA-25

In a sweeping contention, Swaby also argues that Harrison frequently undermined his defense with "bizarre and harmful" conduct. (Pet. Mem. 41.) Much of petitioner's argument focuses on Harrison's comments about the alleged relationship between Dunn and Reynolds, and is thus rejected for the same reasons the Court rejected petitioner's claim about the alleged extreme emotional distress defense. More generally, petitioner contends that Harrison's "outlandish behavior destroyed the integrity of the defense case." (Pet. Mem. 43.) Supreme Court concluded that "while some of defense counsel's behavior cannot be condoned, viewing the totality of the representation, [Swaby] was not deprived of meaningful representation or effective assistance of counsel." People v. Swaby, Memorandum, at 16.

Based on a review of the record, the motion court's determination cannot be said to be unreasonable, or contrary to clearly established federal law. For instance, this Court agrees that "taking the opening remarks as a whole and in [] context, [Harrison] communicated to the jury that the case revolved around self-defense." Id. at 7. Bluntly, petitioner does not offer evidence that Supreme Court erred in finding that Harrison effectively presented the only defense Swaby had—that he feared for his life and shot in self-defense. Petitioner's application for habeas relief

25

on the ground that counsel undermined his case by other inexplicable, disparate comments cannot survive AEDPA analysis.[2]

**D. Counsel's Alleged Failure to Investigate Potentially Exculpatory Leads**

Next in the cross hairs of Swaby's application is counsel's failure to investigate potentially exculpatory leads. Specifically, Swaby argues that redacted police reports given to Harrison prior to trial indicate that there were two additional incident witnesses. (Pet. A-12–13.) Petitioner contends that Harrison's assistance was ineffective because he never followed up on these leads. The motion court rejected these arguments under both prongs of Strickland, reasoning that the witnesses' testimony would have been irrelevant to his justification defense. People v. Swaby, Memorandum, at 15–16. Harrison, Supreme Court contended, was neither unreasonable nor ineffective in failing to follow up because he could have made a rational judgment that the testimony would not have been useful to Swaby's case. Id.

Eyes, of course, must be kept on the prize. While this Court does not agree with the motion court that the information would have been literally "irrelevant," People v. Swaby, Memorandum, at 16, it does agree that, in the totality of the circumstances, Harrison's failure to pursue the information did not qualify as Strickland ineffectiveness. Especially in light of Swaby's own testimony, the probative value of the information at issue was, at best, nominal. Indeed,

---

[2] Moreover, even if counsel's performance was deficient, Swaby cannot demonstrate prejudice. See infra Part H.

26

petitioner's current argument that "it is clear that the two witnesses may have seen details of the incident beyond what was recorded in the police reports" is entirely speculative and is belied by the statements themselves. Neither gives any indication that either witness saw the shooting. In fact, one of the reports specifically indicates that the declarant did not see it. (See Pet. A-12–13.) Harrison's decision not to further investigate, though hardly a shining moment, was reasonable. More importantly, Supreme Court's rejection of this claim after testing it against both Strickland prongs, was not clearly unreasonable, nor was it contrary to federal law. Therefore, even if the state court's determination would not be that of the federal court on de novo review, it survives review under AEDPA.

E. Counsel's Alleged Failure to Object to Improper Conduct by the Prosecutor

Swaby continues his attack on Harrison's performance as constitutional counsel by zeroing in on his failure to object when the prosecutor (1) questioned petitioner about a fake driver's license he was carrying when he was arrested (Tr. 361–62), and (2) said, during his summation, that part of Swaby's testimony was "made up." (Pet. 13.) The motion court correctly concluded that whether or not to object under these circumstances is generally a matter of trial strategy. People v. Swaby, Memorandum, at 14–15; Mazique v. Ercole, No. 06-CV-1723, 2008 WL 2884370, *9 (E.D.N.Y. July 23, 2008); see also Johnson v. Conway, No. 09-CV-0095, 2011 WL 53165 (W.D.N.Y. Jan. 7, 2011). Supreme Court also correctly pointed out that "[e]ven if counsel's failure to object was error, it did not . . . prejudice the

27

**SPA-28**

defendant." People v. Swaby, Memorandum, at 15.  Given the Court's review of the record, Supreme Court's conclusion on this point was reasonable and consistent with clearly established federal law.

### F. Evidence of Swaby's Criminal History and Previous Bad Conduct

On direct examination, Harrison elicited testimony from Swaby that he had recently robbed someone with a knife.  (Tr. 322–23.)  In rejecting the ineffective assistance claim based on the elicitation of that testimony from Swaby by his own lawyer, Supreme Court reasoned that Harrison was introducing the evidence so he could control its original presentation to the jury, due to his concern that the prosecutor would otherwise elicit it on cross examination.  People v. Swaby, Memorandum, at 17 n. 54.  That analysis would certainly be controlling if such an inquiry would have been fair game for the prosecutor.  However, the motion court appears to have failed to take into account the fact that, following a Sandoval hearing, the prosecution was precluded from eliciting any evidence of Swaby's past crimes.  (Pet. Mem. 42.)  Thus, unless Swaby opened the door to the introduction of such evidence on direct, past bad act evidence was inadmissible.  Respondent, seemingly recognizing the state court's flawed reasoning, argues that the introduction of the knife-point robbery was an attempt by Swaby's counsel to support an argument that Swaby did not have past experience with guns.  (Respondent's Memorandum of Law in Opposition, filed on January 25, 2007 ("Resp. Mem."), 21.)

28

The People's speculation about Harrison's thought process is not comforting. Perhaps based on circumstances not present here, where, for instance, a person has a long and consistent history of using only knives to commit crimes, it would be a sustainable strategy to offer such evidence to make it look less likely that the accused would use a gun, and, therefore, more likely that he was innocent. Clearly, Harrison's elicitation of the bad act testimony about the past knife robbery did not fit that bill. On the totality of the circumstances, at any rate, Harrison's inquiry of Swaby cannot be seen as anything other than a significant blunder—his performance on this aspect of the case cannot be described as effective assistance. The state court's ruling to the contrary was unreasonable. See, e.g., Miller v. Senkowski, 268 F. Supp. 2d 296, 313 (E.D.N.Y. 2003).

Nevertheless, this blunder by Harrison does not justify the issuance of the writ for Swaby because the Court concludes that the motion court's rejection of his claim based on its complete analysis was reasonable. See People v. Swaby, Memorandum, at 17 n. 54 (stating that the court considered the claim "in its totality of evidence analysis" and concluded it was "improper"). Put another way, although Supreme Court did not use precise language in its opinion, from context, and its reference to the "totality of evidence analysis," the state court rejected vacatur of the conviction because it concluded that, even if Harrison's performance on this point was deficient, there was no prejudice to Swaby, and consequently, under Strickland, no constitutional ineffectiveness. Given the overwhelming evidence of

29

SPA-30

Swaby's guilt presented at trial, the Court finds that the state court could have reasonably concluded that there was no prejudice to Swaby as a result of this particular deficiency of trial counsel.

G. Counsel's Failure to Consult a Forensic Expert

Petitioner argues that Harrison's failure to retain an expert to challenge the People's version of the incident—specifically, Clarke's eyewitness account of the shooting—renders his performance deficient, and his assistance constitutionally ineffective.  Had a defense forensic expert testified about Reynolds's wounds, petitioner submits, there would have been a substantial likelihood of a different result because the expert evidence would have both contradicted Clarke's version of the shooting, and bolstered Swaby's.  Supreme Court concluded that Harrison's decision not to consult with or retain a forensic expert "was part of a reasonable, albeit, unsuccessful trial strategy." People v. Swaby, Memorandum, at 12.  The question now is whether this determination was contrary to, or an unreasonable application of, federal law.  Harrington, 131 S. Ct. at 790.

1)  Counsel's Deficient Performance

First, Supreme Court's determination of Swaby's post-conviction § 440.10 motion was contrary to clearly established federal law because the court appears to have based its analysis of Harrison's failure to consult and/or retain an expert on the evidence presented at trial, instead of the circumstances that existed when Harrison made the decision not to investigate the forensics related to Clarke's

30

SPA-31

testimony. People v. Swaby, Memorandum, at 12. When determining whether an attorney's decision not to investigate was reasonable, courts must consider the circumstances that existed at the time that decision was made.[3] Rompilla v. Beard, 545 U.S. 374, 381 (2005). That the central issue in this case was whether Swaby acted in self defense would have been apparent to any competent attorney at the outset. And, whether a jury would believe Swaby's self defense claim, competent counsel would have had to have known, was clearly going to turn on whether Swaby's account of the shooting was objectively credible. Thus, in real time, at the start of defense preparation, any potential forensic evidence either supporting Swaby's version of events or somehow undercutting the prosecution's was critical to the case.

　　The Court cannot imagine any reasonable excuse for Harrison's failure to see the utility of an expert who could provide a favorable opinion about the most important questions surrounding the circumstances of Reynolds's death. Unquestionably, an effective defense could not be provided without such an investigation. Beyond doubt, Harrison's decision not to consult and/or retain a forensic expert was manifestly unreasonable, as was the state court's determination to the contrary.

---

[3] Hindsight, of course, can be dispositive on the second prong of Strickland. If it were to turn out that no version of the facts would support a contrary forensic opinion, the failure to investigate that opinion would not be prejudicial and counsel's performance, while deficient, would not be constitutionally ineffective.

31

It is true, of course, that Supreme Court also concluded in its § 440.10 decision that Harrison had acted reasonably in not investigating the retention of a forensic expert to impeach Clarke because he wanted to avoid damaging Clarke's credibility, since part of Clarke's testimony was helpful to Swaby's theory of self defense. People v. Swaby, Memorandum, at 12. While the strategic decisions of counsel, such as whether and to what extent to cross-examine a prosecution witness, made after a full investigation, are virtually unchallengeable, no deference is owed to strategic decisions made after a less than complete investigation. Harris v. Artuz, 288 F. Supp. 2d 247, 259–60 (E.D.N.Y. 2003), aff'd, 100 F. App'x 56 (2d Cir. 2004); Strickland, 466 U.S. at 690–91. "In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Strickland, 466 U.S. at 690–91.

Here, Harrison did neither. Whatever help Clarke's testimony might have given to the petitioner's defense was vastly outweighed by the fact that Clarke, the only eyewitness to the shooting, testified that Swaby shot Reynolds before Reynolds even got near him, and then, after Reynolds was felled by gunfire, that Swaby shot a defenseless Reynolds in the head multiple times at close range. Clarke's testimony, indeed, was the crux of the People's case, and was almost completely in conflict with Swaby's version of events. In short, Clarke's testimony was devastating to the defense and he had to be impeached, if at all possible. Forensic evidence could have

32

been the ground for impeachment. It had to be pursued unless and until an adverse report ruled it out.

Accordingly, the motion court's finding that counsel acted reasonably in deciding not to investigate the forensics related to Clarke's testimony was clearly unreasonable. Even when guided by AEDPA deference, Harrison's performance on this point does not pass muster under Strickland's first prong.

## 2) Lack of Prejudice to Petitioner

Though, as detailed above, the Court finds Harrison's performance strikingly deficient, more is required to warrant federal habeas relief. Strickland's second prong steps beyond ineffective performance. Because the Court concludes that, based on the overwhelming evidence of Swaby's guilt, viewed in the totality of the circumstances, Swaby would have been convicted regardless of Harrison's deficiencies, on AEDPA review, the state court's ultimate conclusion that Harrison was not constitutionally ineffective cannot be disturbed.

Petitioner, of course, contends that prejudice is palpable. Swaby argues that had a defense expert testified about Reynolds's wounds, the testimony would have introduced a reasonable probability of a different result, both by undercutting Clarke's version of the shooting and supporting Swaby's version. Positing a hypothetical expert to offer a hypothetical contrary forensic opinion would presumably be far too speculative to meaningfully impact post-conviction relief

33

proceedings. So, to support this argument on his § 440.10 motion, Swaby presented

the affidavit of Dr. Howard Adelman, a criminal pathologist.  (Pet. A-7.)

Despite petitioner's contrary assessment, however, the descriptions of the five

bullet wounds offered by Dr. Adelman simply do not conflict with Clarke's

testimony.  Clarke told the jury that two bullets were fired while Reynolds was

approaching Swaby—matching the two bullets that Dr. Adelman described as

having a front to back progression.  (See Pet. A-8 (descriptions of bullets 1 and 3).)

Clarke then testified that additional shots were fired as Reynolds was lying

motionless with his head on the ground—matching the three bullets that Dr.

Adelman described as travelling in the same general, left to right direction.  (Id.

(description of bullets 2, 4, and 5).)  Unserendipitously for petitioner's argument

here, Reynolds's five bullet wounds are perfectly consistent with Clarke's

testimony.[4]

---

[4] Petitioner would love to brush aside the corroborative support Dr. Adelman's report would
have supplied to the prosecution case by limiting focus to the contention that none of the shots
could have been fired as Reynolds lay face-down on the ground.  (Pet. Mem. 25.)  This
argument, however, is premised on a gross misconstruction of both the medical evidence and
Clarke's description of the scene.  First, although Dr. Adelman determined that none of the shots
could have been fired as Reynolds lay face-down because no shots entered the back of his head,
what Dr. Adelman and petitioner miss is that the testimony taken as a whole supports a finding
that Reynolds was lying on his stomach, with his head facing to the side—that is, lying on his
right cheek, rather than nose down.  (Tr. 84–85, 128, 179–82.)  Second, Dr. Adelman's
conclusion that the fatal shot could not have been fired as Reynolds was lying on the ground
because it entered through the top of his head is also contradicted by the record evidence.  The
fatal bullet to which Dr. Adelman refers (see Pet. A-8 (description of bullet 4)) did not enter the
top of Reynolds's head as if, for example, the gun was positioned directly above Reynolds and
directed straight down.  Instead, that bullet entered the left-side crown of his head, and
(importantly) traveled (1) left to right, (2) back to front, and (3) downward.  (Tr. 297–99.)  The

34

SPA-35

To cut to the quick, Swaby fails to demonstrate that, had Harrison called a forensic expert, indeed the very forensic expert he proffers on his habeas petition, there was a "reasonable probability that the trier of fact would have rejected the entirety [of the main prosecution witness's testimony] as not credible." Gersten v. Senkowski, 426 F.3d 588, 612 (2d Cir. 2005). Far more probable, and consistent with the testimony of all witnesses save Swaby, the expert testimony Dr. Adelman would have given if called, would have bolstered the prosecution's case. Since Swaby cannot demonstrate that he suffered prejudice from Harrison's failure to consult and/or retain a forensic expert, his application for habeas relief on this ground is denied.

H. Aggregate Prejudice

Courts "must also analyze the cumulative effect of counsel's failure[s]" in assessing the issue of prejudice. Robles v. Lempke, No. 09-CV-2636, 2012 WL 5507303, at *7 (E.D.N.Y. Nov. 14, 2012) (citing Lindstadt v. Keane, 239 F. 3d 191, 199, 202 (2d Cir. 2001)). In doing so, they "must keep in mind that a verdict or conclusion only weakly supported by the record is more likely to have been affected by counsel's errors," and, "[c]onversely, where there is overwhelming evidence of guilt, even serious errors by counsel will not warrant granting a writ of habeas corpus." Gersten v. Senkowski, 426 F.3d 588, 611 (2d Cir. 2005) (citations and internal quotation marks and alterations omitted).

---

left to right progression is, like two of the other bullets, consistent with Reynolds lying on the ground, on his stomach, right-cheek down.

Here, all of the alleged instances of ineffective assistance, considered alone, have been found to be without merit.  That result does not change when they are considered in the aggregate.  Evidence of Swaby's guilt is overwhelming.  An impartial eyewitness testified that Swaby fired multiple shots into the head of a motionless and helpless man as he lay bleeding on a curb.  No forensic evidence introduced at trial, or produced by petitioner here, contradicts that account of the shooting.  As a consequence, although Harrison's performance was deficient in at least two respects, including the unnecessary introduction of past bad act evidence and failure to consult with a forensic expert, his errors do not render the result of Swaby's trial unreliable or "undermine confidence in the outcome."  Lindstadt, 239 F. 3d at 204; see also Henry v. Poole, 409 F.3d 48, 64 (2d Cir. 2005); Rosario v. Ercole, 601 F.3d 118, 122–28 (2d Cir. 2010).  Swaby, simply, has not met his burden under Strickland's second prong with respect to aggregate prejudice.  The writ cannot issue.

I. Failure to Present Mitigating Evidence at Sentencing

Finally, petitioner claims that defense counsel was ineffective at sentencing because he consented to the sentencing proceeding even though Swaby had not been interviewed for a statutorily-required pre-sentence report (Pet. Mem. 45–46 (citing C.P.L. § 390.20)), and because he did not present any mitigating facts to the sentencing judge.  On petitioner's § 440.10 motion, Supreme Court found the claim was meritless since (1) Swaby did not state important mitigating facts that Harrison

could or should have presented of which the sentencing judge was unaware, (2) the sentencing court was already familiar with Swaby's background through his trial testimony, and (3) Swaby made a statement at sentencing, during which he could have informed the sentencing court about important mitigating information that Harrison had failed to present. People v. Swaby, Memorandum, at 17. The motion court found, as a consequence, no reason to upset the relatively standard New York 25 years to life sentence imposed on Swaby for a murder in the second degree conviction.

Supreme Court's judgment on this point is more than reasonable; it is compelling. The Court agrees that, even if Harrison was constitutionally deficient in failing to present or re-package mitigating evidence to the sentencing court (or allow probation to do so), there was no prejudice to Swaby because the sentencing court, as the record shows, was aware of virtually all of the important facts that might arguably be viewed as the mitigating evidence that petitioner claims Harrison should have presented at sentencing. Additionally, Swaby himself had an opportunity at sentencing to make a statement to the sentencing judge, which could have, as appropriate, contained words of explanation, mitigation, and/or contrition. But, most critically, neither the record at sentencing, nor as it is supplemented on this habeas application suggests that any significant mitigating factor was omitted from the sentencing court's consideration. Yet, all of this begs the question. The issue is not whether there were opportunities missed because of trial counsel's

**SPA-38**

deficiencies, but, assuming that there were, is habeas relief mandated as a result? Here, it is not, because, most persuasively, petitioner does not point to, on this application, the existence of the kind of "powerful" mitigating evidence that federal courts have found results in prejudice if not presented at sentencing. See Wiggins v. Smith, 539 U.S. 510, 534 (2003). Thus, the Court finds that the state court's determination that there was no merit to Swaby's claim of ineffective assistance of trial counsel at sentencing was reasonable, and, comports with relevant Supreme Court precedent. The writ cannot stand on this ground either.

<u>Conclusion</u>

For the foregoing reasons, Jermaine Swaby's petition for habeas corpus is dismissed and the writ is denied. However, the Court finds that Swaby has made a substantial showing of the denial of a constitutional right in that the performance of his trial counsel was, in part, constitutionally deficient. As a result, a certificate of appealability shall issue with respect to the Court's finding that trial counsel's (1) introduction of past bad act evidence, and (2) failure to consult with a forensic expert, did not constitute constitutionally ineffective representation. Issuance of the certificate rests on the Court's conclusion that reasonable jurists could disagree as to whether, on these grounds, Swaby's petition should have been resolved differently. See 28 U.S.C. § 2253(c); Slack v. McDaniel, 529 U.S. 473, 483–84 (2000).

**SPA-39**

The Clerk of Court is directed to enter judgment in favor of respondent and to close this case.

**SO ORDERED.**

Dated: Brooklyn, New York
        March 25, 2014

s/Eric N. Vitaliano

**ERIC N. VITALIANO**
**United States District Judge**

39

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
JERMAINE SWABY,                                           JUDGMENT
                                                          06-CV- 3845 (ENV)
                        Petitioner,

        -against-

THE PEOPLE OF THE STATE OF NEW
YORK,

                        Respondent.
-------------------------------------------------------X

        A Memorandum and Order of Honorable Eric N. Vitaliano, United States District

Judge, having been filed on March 31, 2014, dismissing Petitioner's petition for habeas corpus

and denying the writ; issuing a Certificate of Appealability with respect to the Court's finding

that trial counsel's (1) introduction of past bad act evidence, and (2) failure to consult with a

forensic expert, did not constitute constitutionally ineffective representation; ordering that

issuance of the Certificate rest on the Court's conclusion that reasonable jurists could disagree as

to whether, on these grounds, Petitioner's petition should have been resolved differently; and

directing the Clerk of Court to enter judgment in favor of Respondent; it is

        ORDERED and ADJUDGED that Petitioner's petition for habeas corpus is

dismissed; that the writ is denied; that a Certificate of Appealability is issued with respect to the

Court's finding that trial counsel's (1) introduction of past bad act evidence, and (2) failure to

consult with a forensic expert, did not constitute constitutionally ineffective representation; that

issuance of the Certificate rests on the Court's conclusion that reasonable jurists could disagree

as to whether, on these grounds, Petitioner's petition should have been resolved differently; and

SPA-41

**JUDGMENT** 06-CV-3845 (ENV)

that judgment is hereby entered in favor of Respondent and against Petitioner.

Dated: Brooklyn, New York
      April 07, 2014

                                     Douglas C. Palmer
                                     Clerk of Court

                    by:    */s/ Janet Hamilton*
                                      Deputy Clerk

2